# United States Court of Appeals
## For the First Circuit

No. 05-2772

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN J. CONNOLLY, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lipez, Circuit Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Terrance J. McCarthy, by appointment of the court, with whom Edward J. Lonergan and E. Peter Mullane were on brief, for appellant.
William J. Nardini, Special Attorney, with whom Michael J. Sullivan, United States Attorney, and John H. Durham, Special Attorney, were on brief, for appellee.

October 16, 2007

**SELYA**, **Senior Circuit Judge**.  Defendant-appellant John J. Connolly, Jr., a disgraced former agent of the Federal Bureau of Investigation (FBI), appeals from the denial of his motion for a new trial in a celebrated criminal case.  Connolly musters multiple theories in support of his appeal, all of which emanate from the same trove of newly discovered evidence.  Unimpressed by the quality of this evidence and constrained by a deferential standard of review, we conclude that the district court acted within the encincture of its discretion in denying the motion.

## I.  BACKGROUND

The federal courts are by now painfully familiar with the Winter Hill Gang and its corrupt relationship with the Boston office of the FBI.  See, e.g., United States v. Flemmi, 225 F.3d 78 (1st Cir. 2000); United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999); United States v. Salemme, 978 F. Supp. 343 (D. Mass. 1997).  The appellant has been prominently featured in several such opinions.  See, e.g., McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004) (addressing civil suit filed by putative victims' heirs against the appellant and others).  To flesh out the background, there is a published opinion in this case, upholding the appellant's conviction on direct review.  See United States v. Connolly, 341 F.3d 16 (1st Cir. 2003) (Connolly I).  We assume the reader's familiarity with these opinions and rehearse here only those facts most directly relevant to this appeal.

-2-

Beginning in the early 1970s, the appellant was an FBI agent in Boston. During his tenure, he served as the "handler" of two "top echelon" informants: James ("Whitey") Bulger and Steven ("the Rifleman") Flemmi. Although nominally part of the Winter Hill Gang, Bulger and Flemmi frequently consorted with the Boston branch of La Cosa Nostra and purported to transmit inside information to the FBI concerning organized crime activities in New England. This relationship persisted until 1990 — the year of the appellant's retirement — when the FBI cut the umbilical cord and "closed" Bulger and Flemmi as informants.

Notwithstanding their former alliance, the FBI knew (or at least suspected) that Bulger and Flemmi had been hip-deep in criminal activity all along. An intensive federal probe ensued. In December of 1994, the FBI's case against Bulger, Flemmi, and their cohorts was poised to precipitate an indictment. The indictment, scheduled to be rolled out on January 10, 1995, targeted the two quondam informants as well as several other mobsters. Despite the veil of secrecy attached to grand jury proceedings, two of the targets — Bulger and Francis ("Cadillac Frank") Salemme — fled before the indictment was unsealed.

In short order, the indictment was made public; several defendants, including Flemmi, were arrested; and Bulger and Salemme became fugitives. Nearly eight months later, the authorities apprehended Salemme in Florida. Bulger remains at large.

Four years after the initial indictment, a different grand jury handed up a related indictment. This second indictment named both Flemmi and the appellant as defendants. Pertinently, it charged the appellant with racketeering, obstruction of justice, and conspiracy. A superseding indictment, fashioned in October of 2000, added a charge of making a false statement as well as additional counts of obstruction of justice.

The superseding indictment sketched a corrupt relationship between the appellant and the Winter Hill Gang. In the course of that relationship, the appellant allegedly sold protection, the identities of FBI informants, and the like to Bulger and Flemmi in exchange for a googol of bribes and favors. The relationship allegedly continued even after the appellant retired; one of his final acts was said to be the tip to Bulger and Salemme that allowed them to abscond before the looming indictment materialized.

The appellant proclaimed his innocence and stood trial on the superseding indictment. The jury found him guilty on charges of racketeering, obstruction of justice, and making a false statement. See 18 U.S.C. §§ 1962(c), 1503, 1001. On September 16, 2002, the district court sentenced him to 121 months in prison followed by two years of supervised release. We affirmed both his conviction and his sentence. See Connolly I, 341 F.3d at 35.

On May 27, 2005 — almost three years to the day after the jury returned its verdict — the appellant moved for a new trial. See Fed. R. Crim. P. 33. The motion rested on four categories of newly discovered evidence, each of which (according to the appellant) undermined the case against him and contributed to a showing that the government had acted unlawfully.

The first of these proffers constituted an FBI 302 report. That report, promptly disclosed to the appellant's counsel and the trial judge by the government, memorialized the accusations of a confidential source (CS). The CS, himself a mobster of some repute, recounted purported jailhouse conversations with Salemme (who had been a prominent witness at the appellant's trial). According to the CS, Salemme, while incarcerated, had recanted almost the entirety of his testimony, confessing that he had perjured himself and describing how the government had urged him down the path of prevarication.

The appellant's second evidentiary proffer consisted of a 2004 report by the Committee on Government Reform of the United States House of Representatives. H.R. Rep. No. 108-414 (2004), available at http://www.gpoaccess.gov/serialset/creports/everything-secret.html. That report, titled in part "The FBI's Use of Murderers as Informants," is a caustic chronicle of the dark side of the FBI's relationship with organized crime spanning three decades (from the mid-1960s through the mid-1990s). The appellant

-5-

offered the report in an apparent effort to show that the United States Attorney's Office in Massachusetts was no stranger to internal misconduct.

The appellant's third proffer comprised a list of alleged discrepancies between the testimony of witnesses who had testified at his trial and things that those same individuals subsequently said in depositions taken in a gallimaufry of civil actions. Fourth, and finally, the appellant pointed to Salemme's recent indictment for making false statements to federal agents.

The government opposed the motion. As part of its opposition, it submitted affidavits from five members of the prosecution team, three of whom were lawyers and all of whom flatly denied any knowledge of misconduct or perjury.

On November 15, 2005, the district court summarily denied the motion. The court acted without holding a hearing and saw no need to write a rescript. This timely appeal followed.

## II. ANALYSIS

The appellant's briefs present four different, but interrelated, theoretical bases for relief. These rest on (i) newly discovered evidence; (ii) withholding of evidence by the government; (iii) prosecutorial misconduct (related to perjury and the withholding of evidence); and (iv) manifest injustice. We address the first two theories as an ensemble. We then comment upon the absence of an evidentiary hearing. Finally, we explain,

albeit briefly, why we need not consider the appellant's third and fourth theories.

### A. **The Preserved Theories**.

The appellant's first two theories implicate newly discovered evidence and the withholding of evidence, respectively. Both of these closely related theories were squarely raised below and, thus, are properly preserved. Consequently, we consider them on the merits. We start, however, with the applicable legal standards.

A district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a "judgment call." United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir. 2007). Hence — at least where the trial judge revisits the case to pass upon the new trial motion — an appreciable measure of respect is due to the "presider's sense of the ebb and flow of the recently concluded trial." United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991). We therefore review such rulings solely for abuse of discretion. See United States v. Alicea, 205 F.3d 480, 486 (1st Cir. 2000). Of course, a district court abuses its discretion whenever it predicates its ruling on an erroneous view of the law, see United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998), and abstract questions of law engender de novo review, see United States v. Josleyn, 206 F.3d 144, 151 (1st Cir. 2000). A claim that

the district court applied an incorrect standard falls within this purview.

The appellant attempts to complicate this rather straightforward set of rules. First, he claims that different standards of review apply to motions for new trials in criminal cases depending upon whether governmental withholding of evidence is alleged. Insofar as the standard of review is concerned, we implicitly have rejected that distinction in earlier cases, see, e.g., Maldonado-Rivera, 489 F.3d at 65; Josleyn, 206 F.3d at 151, and we explicitly reject it here.

Second, the appellant contends that the order appealed from should be reviewed de novo because the district court summarily disposed of his motion without composing an opinion. This contention is unpersuasive. While we always value an elaboration of the district court's reasoning, it has long been recognized that a written rescript is not a sine qua non for the disposition of a new trial motion in a criminal case. See, e.g., United States v. Mangieri, 694 F.2d 1270, 1284-87 (D.C. Cir. 1982); United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980); United States v. Holy Bear, 624 F.2d 853, 856 (8th Cir. 1980). Nor does the lack of such a rescript automatically trigger a more searching standard of appellate review. When the trial court has not expounded its rationale, the court of appeals will peruse the record, identify the issues and the controlling legal rules, and

-8-

review the denial of the motion accordingly.  Cf. United States v. Malpica-Garcia, 489 F.3d 393, 395 (1st Cir. 2007) ("[W]e may affirm a district court judgment on any ground supported by the record.").

We turn from the standard of review to the standards that attend the resolution of a criminal defendant's motion for a new trial on the basis of freshly discovered evidence.  Typically, the defendant must make a four-part showing: (i) that the evidence was unknown or unavailable to him at the time of trial; (ii) that his failure to learn of it did not result from a lack of due diligence; (iii) that the evidence is material, not merely cumulative or impeaching; and (iv) that its availability is likely to bring about an acquittal upon retrial.  United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999); Wright, 625 F.2d at 1019.  Every element of this test (known in this circuit as the "Wright test") is essential, and a failure to establish any one element will defeat the motion.  Maldonado-Rivera, 489 F.3d at 66.

A somewhat different paradigm applies when the defendant makes a colorable claim that he would have had access to the newly discovered evidence but for the government's failure to disclose it in accordance with the imperatives of Brady v. Maryland, 373 U.S. 83, 87 (1963).  See United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001).  This more defendant-friendly standard applies, then, to what are colloquially known as "Brady violations."

-9-

There are three components of an authentic <u>Brady</u> violation. The evidence at issue (whether exculpatory or impeaching) must be favorable to the accused; that evidence must have been either willfully or inadvertently suppressed by the government; and prejudice must have ensued. <u>Strickler</u> v. <u>Greene</u>, 527 U.S. 263, 281-82 (1999). For purposes of a new trial motion, the same standard applies to claims that the government knowingly used perjured testimony. <u>González-González</u>, 258 F.3d at 21. That standard, however, does not extend to the unwitting use of perjured testimony. <u>Huddleston</u>, 194 F.3d at 221.

Although we have said that this standard (which we shall sometimes call the "<u>Brady</u> standard") is defendant-friendly, that does not mean that proof of a <u>Brady</u> violation automatically entitles a defendant to a new trial. Even a defendant who moves for a new trial on the basis of one or more <u>Brady</u> violations still must establish the first two elements of the <u>Wright</u> test. The difference affects only the latter two elements; in a <u>Brady</u> scenario, those elements are replaced with the unitary requirement that the defendant establish "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States</u> v. <u>Bagley</u>, 473 U.S. 667, 682 (1985); <u>see</u> <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 434 (1995) (characterizing that "reasonable probability" as sufficient to "undermine[] confidence in the outcome of the trial").

-10-

At least two other nuanced differences distinguish the two standards.  First, the <u>Wright</u> test demands an <u>actual</u> probability that the result would have differed, whereas the <u>Brady</u> test speaks in terms of something less — a merely theoretical (but still reasonable) probability.  <u>See</u> <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1216, 1220 (1st Cir. 1993).  Second, the <u>Wright</u> test categorically discounts "merely impeaching" evidence as "immaterial." <u>Wright</u>, 625 F.2d at 1019.  When a <u>Brady</u> violation is involved, however, the <u>Wright</u> materiality inquiry disappears as a distinct element, with the result that undisclosed impeachment evidence, if it suffices to undermine confidence in the outcome of the trial, may carry the day. <u>See</u>, <u>e.g.</u>, <u>Bagley</u>, 473 U.S. at 682 (applying <u>Brady</u> test to impeachment evidence); <u>United States</u> v. <u>Dumas</u>, 207 F.3d 11, 16 (1st Cir. 2000) ("[W]e recognize that impeachment evidence, if powerful enough, could constitute grounds for a new trial . . . .").

Against this backdrop, we consider the "new" evidence proffered by the appellant to see how that evidence fares.  As a preliminary matter, we note the appellant's allegation that all of this evidence is prejudicial and that almost all of it would have been available to him at trial but for the government's wrongful withholding.[1]

---

[1]One prominent exception consists of Salemme's alleged perjury with respect to his involvement in the murder of Stephen DiSarro. We discuss that proffer separately.  <u>See</u> text <u>infra</u>.

-11-

This is a dubious premise. The law is settled that "[n]o inference of government knowledge of perjury arises from the mere fact of a convict's hearsay report that a material witness recanted testimony." González-González, 258 F.3d at 23. In an abundance of caution, however, we elect to examine this evidence under the more defendant-friendly Brady standard. Should the appellant's challenges fail under this standard, then a fortiori they would fail under the more stringent standard applicable to non-Brady claims. See Josleyn, 206 F.3d at 148 n.2.

The appellant places most of his emphasis upon Salemme's jailhouse recantation. To recapitulate, Salemme had been a witness at the appellant's trial. His testimony was helpful to the prosecution; he testified, among other things, that on several occasions the appellant had given assurances that he would keep Salemme apprised of developments with respect to the ongoing federal investigation. Salemme also testified that, on January 5, 1995 — two weeks after the appellant allegedly had leaked information about the nascent indictment — he had met with Flemmi and other mobsters at the home of Salemme's ex-wife; that Flemmi had informed him that the indictment was about to be unsealed; and that Flemmi knew that fact thanks to the appellant.

Importantly, however, Salemme's testimony did not occur in a vacuum. Several other witnesses corroborated aspects of it. Most notably, Kevin Weeks, Whitey Bulger's former aide-de-camp,

-12-

testified extensively about the appellant's corrupt relationship with the Winter Hill Gang. For example, Weeks described an episode that transpired on December 23, 1994, when he met with the appellant at a local Winter Hill hangout. The appellant summoned him into a cold-storage freezer and informed him of the impending indictment. Others — such as the appellant's secretary, Kathleen Orrick, and his high-school chum, John Ford — testified to Salemme being in the appellant's company at roughly the times that Salemme claimed to have been. Salemme's ex-wife, Alice McLaughlin, also confirmed that the January 5 meeting took place at her abode. Thus, although Salemme testified to a number of things as to which no other witness had personal knowledge, much of his testimony received substantial circumstantial corroboration.

As a counterpoint to this testimony, the appellant proffers the FBI 302 report. That report describes the CS befriending Salemme while both men were in the witness protection program. According to the CS, Salemme recounted a litany of prosecutorial misconduct, interwoven with tales of his own mendacity. The CS attributed the following kinds of statements to Salemme:[2]

- The government had shaped his narrative by asking questions such as,

[2]Neither party disputes that the CS's statement to the FBI was made during the fall of 2004. Thus, the statement was not available at the time of trial and the appellant could not have obtained it earlier with even the utmost diligence.

"are you sure it didn't happen like this?" and then describing alternate versions of events.

- Salemme came to realize that the prosecutors wanted him to testify that he had paid the appellant for information, so he obliged.

- Prior to the unsealing of the indictment, Salemme had never met the appellant and was able to recognize him only because the FBI had furnished him with a photograph.

- Salemme ascribed his willingness to help convict the appellant to profound hatred stemming from what the appellant had done to Salemme and his family.

- When shown an article about someone sentenced to several years in prison for perjury, Salemme stated that if the article was accurate, he himself should receive "a thousand years."

This is an illustrative list, not a complete compendium — but it suffices to set the stage for our discussion.

The appellant's rationale is that the report demonstrates that Salemme's trial testimony was made up out of whole cloth. But even if we assume, favorably to the appellant, that the CS faithfully recounted Salemme's rodomontade, the district court easily could have found that recantation unworthy of credence and insufficient to shake its confidence in the jury's verdict. We explain briefly.

"It is well established that recantations are generally viewed with considerable skepticism." United States v. Carbone, 880

-14-

F.2d 1500, 1502 (1st Cir. 1989). Here, the wisdom of that insight is evident. As a mafioso turned government witness, Salemme had called both his honor and his safety into question. It would seem only natural, then, that he would try to rationalize his actions and insulate himself from their consequences. See, e.g., González-González, 258 F.3d at 22 (taking into consideration in Brady inquiry the witness's incentives for recantation given the risk that she might meet defendant in the future); United States v. Badger, 983 F.2d 1443, 1457 (7th Cir. 1993) (discounting probative value of affidavit in light of threats of jailhouse retaliation against affiant); United States v. Leibowitz, 919 F.2d 482, 483 (7th Cir. 1990) (describing affidavit as "not worthy of belief" in light of affiant's psychological frailty and the threats likely communicated by defendant).

The mixture of braggadocio and self-serving excuses contained in the recantation fits this pattern. And Salemme likely would have thought that he had little to lose by boasting about his ostensible perjury in the prison yard to a fellow mobster; there would have seemed to be little chance that the statements could come back to haunt him. In short, Salemme's recantation, like many jailhouse recantations, lacked any meaningful indicia of reliability and, therefore, was "properly regarded as 'highly suspicious.'" United States v. Walker, 25 F.3d 540, 549 (7th Cir. 1994) (citation omitted); see United States v. Goodwin, 496 F.3d 636, 641 (7th Cir.

2007) (noting that inmate composed the recanting affidavit under threat of coercion and later withdrew it); <u>United States</u> v. <u>Baker</u>, 479 F.3d 574, 577-78 (8th Cir. 2007) (refusing to credit hearsay jailhouse recantation by trial witness); <u>González-González</u>, 258 F.3d at 22 (describing evidence as weak when it depended upon the credibility of convicted felons and those under threat of retaliation for their prior adverse testimony).

To be sure, the inference of unreliability that arises from the circumstances of the recantation is merely permissive. Here, however, that inference is reinforced by the record. When one examines the individual assertions that the CS attributes to Salemme, a worrying pattern emerges: many of Salemme's readily verifiable assertions are demonstrably false. We offer a few examples.

First, Salemme supposedly told the CS that his prison term was to be commuted in exchange for his perjured testimony. But the record belies that assertion: it shows unequivocally that the terms of Salemme's reduced sentence were left to the determination of the district court, not the prosecution. For his part, the prosecutor did not advocate for Salemme's release from incarceration but, rather, recommended a 16-month sentence reduction (from 136 to 120 months).

Second, Salemme supposedly told the CS that he did not know the appellant before his indictment and arrest. Yet two

independent witnesses — Orrick and Ford, each of whom was favorably disposed to the appellant — testified very clearly to the contrary. And to add frosting to this particular piece of cake, the record reflects that the appellant personally arrested Salemme in 1972. The district court certainly did not have to accept hook, line, and sinker the totally implausible notion that Salemme could so perfectly turn the other cheek as to expunge from his memory the law enforcement officer who placed him under arrest and set in motion a chain of events that led to him spending 16 years in a federal penitentiary.

Third, and finally, Salemme supposedly told the CS that he had been pressured by the prosecutors. However, the trial record contains nothing that would suggest that this was so. The government filed affidavits from no fewer than five members of the prosecution team flatly denying that any such misconduct had occurred. These affidavits have a patina of plausibility since virtually all of Salemme's initial debriefings were conducted in the presence of his attorney.[3] These debriefings were consistent with the testimony that Salemme later gave at the appellant's trial, and one could just as easily believe in the tooth fairy as believe that

---

[3]Salemme was represented by Anthony M. Cardinale, a veteran criminal lawyer. In an earlier, unrelated opinion, we had occasion to quote from an article in Boston magazine chronicling Cardinale's storied career and noting that "[e]very troubled mobster in [Boston] kisses Cardinale's ring sooner or later." United States v. Boylan, 898 F.2d 230, 258 n.17 (1st Cir. 1990) (quoting "All in the Family," Boston magazine, Aug. 1988, at 18).

a lawyer of Cardinale's stature was complicit in the most brazen sort of prosecutorial misconduct.

These are neither minor nor collateral matters.[4] They go to the very heart of the issues upon which the recantation is meant to shed light. Although the fact that a recantation is peppered with apparent falsehoods does not compel a court to discredit it, that fact certainly gives the court sufficient reason to invoke the hoary doctrine of falsus in uno, falsus in omnibus.[5] A court may reject a recantation on that basis.

---

[4]The government also argues that Salemme lied when, in the course of his recanting statements, he boasted of having perjured himself by testifying as to giving money to the appellant. The government claims that this boast is clearly belied by the trial transcript, according to which Salemme testified to no more than having given money to Flemmi for the purpose of paying it to the appellant.

In this regard, we think that the government demands too much precision, especially given the casual context of the alleged recantation. Salemme plausibly could claim having testified to paying the appellant, even if that testimony did not indicate in haec verba that Salemme personally handed over the cash. Indeed, the government itself appears to have adopted this interpretation of Salemme's testimony; in his summation to the jury, the prosecutor argued that Salemme had testified that "he and Flemmi had been paying money to John Connolly" and that "they had paid $5,000 . . . to Mr. Connolly." We should not place greater demands for precision upon a prison-yard conversation than upon an account provided by a prosecutor in open court.

[5]Although the maxim "falsus in uno, falsus in omnibus" may be fallacious when understood as a mandatory rule of inference, see Dicenso v. Michaels, 668 F.2d 633, 634 (1st Cir. 1982), it retains validity as a basis for a permissive inference, see, e.g., Kanawha & M.R. Co. v. Kerse, 239 U.S. 576, 581 (1916); Castañeda-Castillo v. Gonzales, 488 F.3d 17, 23 (1st Cir. 2007) (en banc); Yongo v. INS, 355 F.3d 27, 33 (1st Cir. 2004).

Two final considerations cement our intuition that the appellant has failed to demonstrate an abuse of the district court's discretion. For one thing, no evidence has been presented suggesting that Salemme himself would be willing, under oath, to admit to perjury. Relatedly, there has not been a credible argument put forth as to how the hearsay account contained in the FBI 302 report could be introduced into evidence. Cf. Fed. R. Evid. 801(d)(1) (defining as non-hearsay prior inconsistent statements "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding"); 804(b)(3) (providing exception for statements against interest when declarant is unavailable). These deficiencies weigh in the balance against reversing the district court's exercise of its discretion. See United States v. Rosario-Diaz, 202 F.3d 54, 66 (1st Cir. 2000) (discounting the force of new evidence in a Brady inquiry in light of the evidence's likely inadmissibility).

For another thing, even assuming that the recantation were true, it would not prove very much. In his musings to the CS, Salemme gave no indication that the appellant was innocent of the charged crimes. In this sense, his recantation, if believed, would merely be impeaching and, consequently, would have a limited effect

upon the outcome of a new trial in which substantial corroborating testimony existed.[6]

Along the same lines, the recantation would to some extent be cumulative. During cross-examination, the jurors learned much about Salemme's unsavory past. They knew, for example, that he was a career criminal who had blood on his hands in consequence of numerous murders and other violent crimes. The jurors also knew the details of his plea bargain with the government.

Given Salemme's extensive criminal history, it would not have been an abuse of discretion for the district court to find that the absence of additional cross-examination on essentially the same well-developed theme would not undermine confidence in the jury's verdict. See United States v. Cruz-Kuilan, 75 F.3d 59, 63 (1st Cir. 1996); see also United States v. Sanchez, 917 F.2d 607, 618-19 (1st Cir. 1990) ("Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist when that evidence is cumulative or collateral.")

---

[6]Though the Brady test does not treat impeachment evidence with the same categorical wariness as does the Wright test, this Court in applying Brady has recognized that the force of impeachment evidence is diminished when the witness's testimony is supported by substantial corroborating evidence, see González-González, 258 F.3d at 22-23, or when the impeachment evidence is "cumulative or collateral." United States v. Sanchez, 917 F.2d 607, 619 (1st Cir. 1990) (citation and internal quotation marks omitted).

(quoting United States v. Shelton, 588 F.2d 1242, 1248 (9th Cir. 1978)).

In this instance, all roads lead to Rome. For the reasons limned above, the jailhouse recantation, even if it occurred, did not require the granting of a new trial.

This conclusion does not end our odyssey. The appellant's motion for a new trial rested on more than Salemme's alleged recantation, so we need to inspect those additional items of "new" evidence.

We start with the appellant's frequent and tantalizing references to a recently issued congressional report and a series of depositions taken over the course of several civil suits arising out of the maraudings of the Winter Hill Gang. Given the passing nature of these references, it is an open question whether the appellant has waived any right to have us consider this evidence. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner" are deemed abandoned). For ease in exposition, however, we assume that the answer to this threshold question is favorable to the appellant and consider the impact of the evidence. As we shall explain, it contributes very little to the appellant's cause.

The congressional report falls to the wayside on relevancy grounds. The report, issued by the Committee on Government Reform of the United States House of Representatives,

-21-

communicates the Committee's low opinion of the FBI's Boston field office in regard to its handling of organized crime matters from the mid-1960s to the mid-1990s. The report also raises a suspicion that, during a 1997 Department of Justice investigation, the United States Attorney's Office withheld evidence that Bulger and Flemmi had been the beneficiaries of federal prosecutorial discretion.

These portions of the report, along with the Committee's complaints about the Department of Justice's ready resort to executive privilege, make interesting reading — but they have nothing to do with the appellant. This trial concerned the lawfulness vel non of the appellant's actions — a subject as to which the report does not speak. Material of such dubious relevance cannot be the basis for the granting of a new trial. See Rosario-Diaz, 202 F.3d at 67 (finding newly discovered evidence purporting to establish victim's involvement in drug operations irrelevant to defendants' conviction for murdering her); United States v. West, 672 F.2d 796, 799-801 (10th Cir. 1982) (holding that newly discovered Department of Justice inquiry into alleged prosecutorial misconduct was not relevant to defendant's guilt).

The deposition testimony is newly discovered in the sense that the civil proceedings for the most part post-dated the appellant's indictment and trial. Many of those excerpts are at least arguably relevant, even though they touch upon predicate acts of which the appellant was not ultimately convicted. As we

concluded on direct review of the appellant's conviction, the jury could have relied upon evidence of those acts in finding him guilty of participating in a continuing criminal enterprise. See Connolly I, 341 F.3d at 27. Relevancy aside, however, the deposition testimony suffers from a different infirmity: the testimonial inconsistencies noted by the appellant are of meager weight. To illustrate, we offer a representative sampling.

The appellant observes that Weeks's trial testimony and Flemmi's deposition testimony conflict as to the length of time that Weeks controlled a particular Winter Hill fund. Unrebutted, though, is the more salient fact, testified to by both men, that the bribes paid to the appellant came out of that fund.

Next, the appellant notes that Weeks's trial testimony about John McIntyre's murder is arguably inconsistent with his deposition testimony in a civil case brought by McIntyre's heirs. At trial, Weeks testified that Bulger murdered McIntyre after learning from the appellant that McIntyre had become a snitch; in his deposition, Weeks seemed to imply that Bulger killed McIntyre because he found him "weak and [not to] be trusted." But these answers are not necessarily inconsistent and, at any rate, the appellant's responsibility for McIntyre's demise was not in issue at trial (that is, the government never charged the appellant with criminal conduct with respect to McIntyre's death). Thus, this "new" evidence could not logically have affected the jury's verdict.

The appellant also envisions an inconsistency between Weeks's testimony that an FBI informant, Halloran, was outed by the appellant and the deposition testimony of a mysterious individual named Ronald Costello that Halloran's informant status was public knowledge. Here, again, there is no necessary contradiction between the two statements (and, thus, no basis for believing that the jury verdict hung in the balance).

Wholly apart from these bits and pieces of evidence, the appellant proffers yet a fourth category of newly discovered evidence. He notes that, on October 27, 2004, a federal grand jury indicted Salemme, alleging that Salemme had deceived federal prosecutors in plea negotiations by falsely denying his involvement in the gangland murder of Stephen DiSarro.

This proffer spotlights an apparent falsehood in Salemme's testimony during the appellant's trial. On cross-examination, Salemme denied having participated in any murders while at the head of La Cosa Nostra in New England. That testimony reiterated a statement that he had made to prosecutors in negotiating his plea bargain. The government cannot square the circle. If it believes that facts exist that prove Salemme's involvement in DiSarro's slaying — and the recent indictment indicates that it does — it cannot be allowed to argue that Salemme was wholly truthful in his trial testimony in this case.

As it happens, this possible perjury is, for present purposes, of minor moment. DiSarro's murder occurred in the course of a criminal enterprise separate from the Winter Hill Gang and remote from the appellant. Furthermore, the jury already was aware of Salemme's nefarious past and had good reason to believe that his every word was not deserving of unqualified respect. In these circumstances, the district court was fully entitled to conclude that neither this alleged perjury nor the attribution of one more murder to Salemme was likely to taint his other testimony.

This situation closely approximates the one before us in Sanchez. There, in the context of a Brady inquiry, we considered the materiality of undisclosed evidence of payments from the Commonwealth of Massachusetts to a witness, made in exchange for the witness's services as an informant. See 917 F.2d at 618. In concluding that the payments were immaterial, we noted that those payments were dwarfed by similar payments made by the federal government — these latter payments having in fact been disclosed — and that the Commonwealth's payments had been for services unrelated to Sanchez's case. Id.

That completes our canvass of the appellant's proffers of newly discovered evidence. None of them creates any plausible basis upon which to question the integrity of the verdict. And here, the whole does not exceed the sum of the parts: it cannot fairly be said that these proffers, each of which is asthenic, gain strength by

aggregation. Taken together, they do not impugn the verdict. <u>See</u>, e.g., <u>Dumas</u>, 207 F.3d at 18.

In all events, as an appellate tribunal we must cede appropriate deference to the trial court with respect to the granting or denial of a new trial motion. <u>See</u> <u>Alicea</u>, 205 F.3d at 486. That deference is magnified where, as here, the judge who considered the motion presided over the trial itself. <u>Natanel</u>, 938 F.2d at 313. Viewed from this vantage point, there is no principled way that we can say the district court abused its discretion in finding this congeries of evidence insufficient to undermine its confidence in the jury verdict.

### B. <u>The Need for an Evidentiary Hearing</u>.

The appellant has a fallback position. He asseverates that the district court should, at the very least, have granted his motion for an evidentiary hearing on the new trial motion.

The baseline rule is that a "criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." <u>United States</u> v. <u>Panitz</u>, 907 F.2d 1267, 1273 (1st Cir. 1990). Accordingly, when considering the question of whether an evidentiary hearing should be granted in connection with a Rule 33 motion, a district court should ask if the defendant made a threshold showing sufficient to warrant such a hearing. <u>Alicea</u>, 205 F.3d at 487. In pursuing this inquiry, the court must make a practical, commonsense evaluation. When, for example, the

-26-

motion is "conclusively refuted . . . by the files and records of the case," an evidentiary hearing would be supererogatory. Carbone, 880 F.2d at 1502; accord González-González, 258 F.3d at 23.

The short of it is that evidentiary hearings on new trial motions in criminal cases are the exception rather than the rule. Such motions ordinarily are decided on the basis of affidavits, without convening evidentiary hearings. See United States v. Kearney, 682 F.2d 214, 219 (D.C. Cir. 1982). Even disputed matters of fact arising from post-trial motions "are often properly decided on the basis of affidavits." United States v. Abou-Saada, 785 F.2d 1, 7 (1st Cir. 1986) (Breyer, J.).

The granting of an evidentiary hearing lies within the district court's sound discretion, and the denial of an evidentiary hearing is reviewed for abuse of that discretion. United States v. Colón-Muñoz, 318 F.3d 348, 358-59 (1st Cir. 2003). The court of appeals should defer, within wide margins, to the district court's assessment — at least when, as in this instance, it is reasonable to believe that the district court possesses a more finely honed sense of the situation and a superior feel for the facts. See, e.g., United States v. Winter, 663 F.2d 1120, 1155 (1st Cir. 1981).

On this record, we see nothing that would demand an evidentiary hearing. The district judge had presided over the trial and was steeped in the lore of the case. The appellant's position, as it appeared from the papers submitted to the court, left few

avenues for additional corroboration. There was no showing below —
and there has been none here — that an evidentiary hearing was
either necessary or desirable.  Consequently, we hold that the
district court acted within the realm of its discretion in denying
the appellant's request.

### C.  **The Unpreserved Theories**.

This leaves the appellant's theories of prosecutorial
misconduct and manifest injustice.  The appellant failed adequately
to raise either of these theories at the trial-court level.  His
original motion for a new trial did not advert to either theory, and
his reply to the government's opposition did not remedy this
omission.

To be sure, the term "prosecutorial misconduct" can be
found scattered throughout the record below.  But these sporadic
allusions to prosecutorial misconduct are unaccompanied by any
attempt at developed argumentation and are bereft of any citations
to relevant authority.  They are, therefore, waived. See Paterson-
Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st
Cir. 1990) ("One should not be allowed to defeat the system by
seeding the record with mysterious references to unpled claims,
hoping to set the stage for an ambush should the ensuing ruling fail
to suit."); see also Zannino, 895 F.2d at 17.

As for manifest injustice (a shorthand for the theory
that the district court's supervisory powers should have been

-28-

exercised to overturn a verdict procured by egregious falsehoods and government misconduct), the appellant's filings below contain not even a glancing mention of this point. A theory that makes its debut in the court of appeals is perforce unpreserved; "[i]t is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals." United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992).

## IV. CONCLUSION

We need go no further. The evidence newly discovered by the appellant is, in Judge Bownes's phrase, "not the straw that would have broken the camel's back; it was just more chaff to scatter in the wind." United States v. Martorano, 663 F.2d 1113, 1119 (1st Cir. 1981). Even under the more defendant-friendly Brady standard, we cannot say that this evidence undermines our confidence in the jury's verdict or justifies a finding that the district court abused its discretion in failing to vacate the judgment and order a new trial.

**Affirmed**.