# United States Court of Appeals
## For the First Circuit

No. 09-2269

UNITED STATES OF AMERICA,
Appellee,

v.

ALEXIS ALVERIO-MELÉNDEZ,
Defendant, Appellant.

No. 09-2277

UNITED STATES OF AMERICA,
Appellee,

v.

ARMANDO GÓMEZ-ORTIZ,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Raymond L. Sánchez-Maceira, for appellant Alverio.
Antonio Bauzá-Torres, with whom Rubén Morales, were on brief for appellant Gómez.
Mariana Bauzá, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Julia M. Meconiates, Assistant United States Attorney, were on brief for appellee.

April 1, 2011

**TORRUELLA, Circuit Judge.** Alexis Alverio-Meléndez ("Alverio") and Armando Gómez-Ortiz ("Gómez") challenge their convictions for (1) conspiracy to possess with intent to distribute cocaine and (2) aiding and abetting in the possession of a firearm in furtherance of a drug trafficking crime. Gómez argues that the evidence was insufficient to convict him on either count; Alverio challenges the sufficiency of the evidence against him on the firearm count. Gómez also contends that the government committed a Brady violation, and both defendants argue that the district court erred in instructing the jury as to the firearm count. For the reasons below, we affirm both convictions.

## I. Background[1]

Rafael Rodríguez-Morales ("Rodríguez"), a paid confidential informant and one of the government's key witnesses at trial, first met Alverio in approximately 2004. At that time, one of Rodríguez's co-workers set up a meeting between Rodríguez and Alverio because the co-worker wanted Rodríguez to re-enter the drug trafficking business. Gómez also attended the meeting, which was at Rodríguez's mother's house. Rodríguez did not find out Gómez's real name at that meeting, but learned that his nickname was "Flaco" or "El Flaco" (i.e., "the skinny one"). During the

---

[1] We recite the facts in the light most favorable to the verdict because the defendants challenge the sufficiency of the evidence. See United States v. García-Álvarez, 541 F.3d 8, 11 (1st Cir. 2008).

meeting, Gómez spoke to Rodríguez about cocaine prices. Alverio said nothing about prices and instead, according to Rodríguez's testimony at trial, "look[ed] at El Flaco, the one that would dictate the drug prices."

Approximately one and a half years later, Alverio started calling Rodríguez and offering to sell him cocaine. Rodríguez, who was by then an informant for the DEA, contacted the DEA but did not receive authorization to proceed with a drug transaction.

In January 2009, Alverio again called Rodríguez. This time, the DEA authorized Rodríguez to proceed and worked with him to record two conversations between him and Alverio. On January 29, 2009, Alverio said, among other things, that he would contact Rodríguez as soon as he had drugs. On February 4, 2009, Rodríguez spoke to Alverio about purchasing six "eighths" (i.e., eighths of a kilogram) of cocaine. The two men agreed to meet at ten o'clock the next day. Alverio said he was going to call a friend in order for the friend to give him the cocaine. Rodríguez asked if "the man," or the owner of the drugs, could reduce the price by one or two hundred dollars. Later in the conversation, Rodríguez asked Alverio if the drugs belonged to the skinny man to whom Alverio had introduced Rodríguez, and Alverio responded that they did.

On February 5, 2009, Rodríguez called Alverio to confirm that they were ready for the drug transaction. When Alverio

arrived at the K-Mart in Fajardo, Puerto Rico, the appointed meeting place, he called Rodríguez, who was inside the store at that point. Alverio guided Rodríguez to the spot where his car was parked, and Rodríguez noticed that there was another man in Alverio's car. When Rodríguez asked Alverio if the second man was "El Flaco," Alverio said that he was. Alverio also said, in response to a question from Rodríguez, that the other man was the owner of the drugs.

When the time came to verify the drugs, Alverio asked Rodríguez if they could move to Rodríguez's car. Rodríguez replied that his car was far away and asked to verify the drugs in Alverio's car. Alverio said that the other man in the car did not want Rodríguez to verify the drugs in the car. When Rodríguez asked again if the second man was the owner of the drugs, Alverio replied affirmatively. Before visually verifying the drugs in Alverio's car, Rodríguez attempted to say hello to Gómez. Several seconds passed before Gómez responded, but when Rodríguez asked Gómez if Gómez remembered him, Gómez said that he did. According to Rodríguez's testimony at trial, Gómez was sitting sideways in the passenger seat of the car with his right hand near his thigh, giving Rodríguez the impression that there was a firearm in the car.

After greeting Gómez, Rodríguez opened a small package, which Alverio had placed in the middle of the car's rear seat, that

looked like a child's lunch box.  The substance inside smelled like cocaine.  Rodríguez then said that the air seemed charged and suggested that they move to another location, Monte Brisas.  The defendants agreed that they should go to Monte Brisas and proceeded to pull away.  Rodríguez, who had one leg inside the car and the other outside, was able to get out before the car departed.  Once out of the car, Rodríguez reported to a DEA official that he felt his life was in danger because there were firearms in the car, and said that the defendants took the cocaine away in their vehicle.

As the defendants drove toward Monte Brisas, they were stopped by a marked police vehicle.  DEA Special Agent Jimmy Alverio ("Agent Alverio"), who had been conducting surveillance in the K-Mart parking lot and who had followed the defendants toward Monte Brisas, assisted.  From the driver's side of the car, Agent Alverio noticed a gun with an extended magazine in the passenger door "pocket."  A firearm examiner later tested the weapon, a Glock .40 caliber pistol, and discovered that it was capable of firing automatically.  Agent Alverio also saw, and later opened, the lunch box in the back seat, which a chemist subsequently determined contained just under three-fourths of a kilogram of 70.7% pure cocaine.

When law enforcement officers arrested Gómez and Alverio, they seized a green fanny pack that Gómez was wearing.  The fanny pack contained, among other things, three .40 caliber bullets, a

magazine that contained fifteen .40 caliber bullets, a slide back cover for a Glock, a drug ledger, and nine vials of crack cocaine. Officers also seized cellular phones from Alverio and Gómez and learned the number of the phone that Gómez was carrying.[2] By analyzing toll records, DEA Agent Álvaro Agreló learned that on at least two occasions, immediately after Rodríguez spoke with Alverio, Alverio's phone was used to dial the phone that Gómez had with him on the day of the arrest.

## II. Discussion

### A. The Sufficiency of the Evidence

We review de novo whether the evidence presented at trial is sufficient to support a conviction. United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010). In doing so, "[w]e take the evidence and draw all reasonable inferences in the light most favorable to the prosecution." Id. We will affirm "[i]f a reasonable jury could find the defendants guilty beyond a reasonable doubt of all elements of the charged offense." Id.

### 1. Gómez's Drug Conviction

Gómez argues that the evidence was insufficient to support his conviction for conspiracy to possess with intent to distribute cocaine. Gómez notes that Alverio, not he, spoke to and negotiated with Rodríguez, and that he was never seen handling the

---

[2] They were already aware of the number of the phone that Alverio used because Alverio had called Rodríguez on that phone.

drugs. In addition, Gómez contends that because the government did not perform any fingerprint analysis on the lunch box containing the drugs, it is unclear whether or not he owned the drugs. Furthermore, Gómez points out that no government agent could corroborate Rodríguez's testimony that Alverio identified Gómez as the owner of the drugs on the day of the arrest. Gómez suggests that Rodríguez's testimony alone is insufficient to sustain his conviction because Rodríguez, who has been convicted of homicide and various other crimes, is not a credible witness.

In order to sustain a conviction for conspiracy under 21 U.S.C. § 846, the evidence must show that (1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy. United States v. Pomales-Lebrón, 513 F.3d 262, 267 (1st Cir. 2008). To prove the underlying offense of possession with intent to distribute, see 21 U.S.C. § 841(a)(1), the government must establish that a defendant "knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute." United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007). In light of these standards, we conclude that the government presented sufficient evidence for a rational trier of fact to find Gómez guilty.

The government provided abundant evidence that Gómez provided the drugs for the transaction and was not merely an

unlucky bystander.  First, Rodríguez testified at trial that Gómez was present when he first met with Alverio at his mother's house to discuss re-entering the drug business, and that Gómez, whom Rodríguez knew as "El Flaco," was the person who told him about prices while Alverio looked on silently.  In addition, the government played a recording of a conversation between Alverio and Rodríguez from February 4, 2009, during which Rodríguez asked if the drugs he was going to buy belonged to "the skinny guy" whom he had met at his mother's house, and Alverio responded affirmatively.

Furthermore, toll records showed that after Alverio spoke with Rodríguez on February 4, the same phone that Alverio had used to speak with Rodríguez was used to dial a cell phone number that corresponded to the cell phone that Gómez had on the day of the arrest.  Given Alverio's comment during the recorded phone call that he was going to call the friend who had the cocaine, the fact that his phone was used to call Gómez's phone provides particularly strong support for the conclusion that Gómez was the source of the drugs.  A second phone call from Alverio's phone to Gómez's phone, placed immediately after Rodríguez called Alverio on the morning of February 5th, also supports the government's theory.[3]

---

[3]  Gómez argues that Agent Agreló's testimony explaining the toll records was impermissible "overview" testimony and should not be considered when analyzing whether the evidence was sufficient to support the verdict.  This argument, which Gómez presents in one sentence in his brief, has been waived because it has not been sufficiently developed.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

In addition, Rodríguez testified at trial that Alverio said on the day of the drug transaction that the man with him in the car was the owner of the drugs. Rodríguez also noted that Gómez, after some delay, acknowledged that he remembered Rodríguez, which supports the government's theory that the man in the car was the same man that Rodríguez met initially at his mother's house.

Moreover, the very fact that Gómez was in the car when the drug transaction took place provides support for the government's theory that he was a coconspirator. As Agent Alverio testified, it is not common for drug traffickers to bring innocent people to drug transactions. Of course, however, "mere presence at the scene of conspiracy activities or simple association with conspirators is not enough, standing alone, to establish participation in a conspiracy." United States v. Rodríguez-Ortiz, 455 F.3d 18, 23 (1st Cir. 2006).

Finally, Gómez's argument that the evidence against him was insufficient because Rodríguez was not a credible witness is meritless. "It is not for us to make credibility determinations in the course of a review of the sufficiency of the evidence." United States v. Morales-Machuca, 546 F.3d 13, 21 (1st Cir. 2008). "A conviction may be based solely on the uncorroborated testimony of a confidential informant so long as the testimony is not incredible or insubstantial on its face." United States v. Gonzalez-Vazquez, 219 F.3d 37, 46 (1st Cir. 2000) (internal quotation marks omitted).

Here, Rodríguez's testimony is not "incredible or insubstantial on its face," nor is it entirely uncorroborated. Toll records and recordings of phone conversations support his version of events.

For all these reasons, the evidence was sufficient to enable a rational factfinder to convict Gómez on the drug count.

### 2. Gómez's Firearm Conviction

Gómez argues that the evidence was insufficient to support his firearm conviction. In order to convict a defendant of possessing a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A), "the government must prove that the defendant[] 1) committed a drug trafficking crime; 2) knowingly possessed a firearm; and 3) possessed the firearm in furtherance of the drug trafficking crime." United States v. Pena, 586 F.3d 105, 112 (1st Cir. 2009).

As discussed above, there was sufficient evidence here to support the conclusion that Gómez committed a drug trafficking crime. In addition, the government presented sufficient evidence that Gómez knowingly possessed a firearm. Agent Alverio testified at trial that he saw a handgun in the "pocket" of the front passenger door when the defendants were arrested, and that Gómez was in the passenger's seat. Another government witness testified that the fanny pack that Gómez was wearing when he was arrested contained three .40 caliber bullets and a magazine containing fifteen more .40 caliber bullets, both of which could be used to

-11-

fire the gun, a Glock .40 caliber pistol, as well as a slide back cover that "is the rear part of the Glock." Finally, Rodríguez testified at trial that he thought Gómez had a gun based on the way that Gómez was positioned. This evidence was sufficient for a rational finder of fact to determine that Gómez knowingly possessed the firearm.

Finally, as discussed in the following section, the evidence was sufficient to support the conclusion that the possession was in furtherance of the drug trafficking crime. Thus, we will not disturb the verdict on Gómez's firearm count.

### 3. Alverio's Firearm Conviction

Citing 18 U.S.C. § 924(c)(1)(A), Alverio argues that the government had to prove that he "1) committed a drug trafficking crime; 2) knowingly possessed a firearm; and 3) possessed the firearm in furtherance of the drug trafficking crime." He insists that the "evidence was insufficient to convince a rational jury beyond a reasonable doubt that [he] possessed the Glock 'in furtherance of' a drug trafficking crime." He was indicted, however, for aiding and abetting in the possession of a firearm in furtherance of a drug trafficking offense, which requires proof that he knew to a practical certainty that Gómez would possess the gun in furtherance of a drug trafficking crime and that he took some step to facilitate the possession. See, e.g., United States v. Medina-Román, 376 F.3d 1, 6 (1st Cir. 2004). Consequently, we

-12-

need only consider that part of his argument that also applies to an aiding-and-abetting conviction -- namely, his claim that the evidence was insufficient to sustain his firearm conviction because the government failed to show that the possession of the firearm was in furtherance of a drug trafficking crime. To support this contention, Alverio points to Rodríguez's testimony at trial that Alverio specifically told Rodríguez he did not want Rodríguez to verify the drugs in his vehicle, that Alverio said Gómez did not want the transaction to take place in Alverio's car, and that Alverio proposed that they go to Rodríguez's car instead. If the gun had been possessed in furtherance of the drug trafficking crime, Alverio claims, Alverio and Gómez would not have wanted Rodríguez to verify the drugs in his own car.

Alverio's argument is meritless because a gun need not be present at the moment that drugs are verified, or at the moment that money or drugs change hands, in order to be possessed in furtherance of a drug trafficking crime. Possession of a firearm "to protect drugs or sales proceeds" can constitute possession in furtherance of a drug trafficking crime. United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008). Here, a rational factfinder could conclude that Gómez had the gun to protect the cocaine on the way to the transaction and the money that the defendants expected to receive -- $3,300 for each of the six "eighths" -- on the way back from the transaction. The evidence would have been sufficient to

support the conclusion that the gun was possessed in furtherance of the drug trafficking crime regardless of where the transaction occurred. Thus, we will not overturn the verdict on Alverio's gun count.

### B. The Jury Instructions

Having concluded that the evidence was sufficient to support both defendants' convictions, we must separately address the claim of instructional error. See United States v. Baldyga, 233 F.3d 674, 682 n.8 (1st Cir. 2000) (noting that a court could consistently conclude both that the evidence was sufficient to support a verdict and that the jury instructions constituted reversible error because of the different legal standards governing the two claims).

The defendants contend that the district court's instructions on the firearm count were flawed in three ways. First, the court erred by instructing the jury on the meaning of "us[ing] or carr[ying]" a firearm "during and in relation to" a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A), when the defendants were charged with "possess[ing] a firearm" "in furtherance of" a drug trafficking crime, id. Second, the court failed to instruct the jury that the mere presence of a firearm in the area where a drug trafficking offense occurs is insufficient to find a defendant guilty of possessing a firearm in furtherance of a drug trafficking crime. Finally, the defendants allege that the

-14-

court improperly coached the jury by incorporating details that mirrored those of their own case into the jury instructions.

We review challenges to jury instructions for plain error where, as here, the defendants failed to object at trial. United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008). Thus, we will not disturb the convictions unless the defendants can prove "(1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected [their] substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009) (internal quotation marks omitted); see also United States v. Olano, 507 U.S. 725, 732 (1993).[4] "[P]lain error review tends to afford relief to appellants only for 'blockbuster[]' errors." United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004) (quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987)); see also United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001) ("[T]he plain-error

---

[4] The government raises the possibility that the district court might have constructively amended the indictment when it instructed the jury on using or carrying a firearm during and in relation to a drug trafficking crime. We need not address this issue. Even if the district court did constructively amend the indictment, the defendants must still prove that prejudice resulted. See United States v. Brandao, 539 F.3d 44, 62 (1st Cir. 2008) (holding that a defendant who alleges constructive amendment of an indictment "must make the required showing of prejudice under Olano and its progeny"). For the reasons discussed below, they cannot do so.

exception is cold comfort to most defendants pursuing claims of instructional error.").

### 1.  Background

The district court gave the following instructions regarding the firearm count, referring throughout to the language of 18 U.S.C. § 924(c)(1)(A) that addresses using and carrying a firearm during and in relation to a drug trafficking crime:

> The defendants are accused of using or carrying a firearm during and in relation to a drug trafficking crime.  Basically, what that means is that while they conspired to commit the offence of possessing with intent to distribute, they at the same time used or carried a firearm.
> . . . .
>      . . . You have to figure out from the evidence you received here whether indeed there was a gun here to begin with; and, number two, whether this gun was possessed, used, carried during the commission of a drug trafficking offence.
>      So the following things have to be proven.  First, that the defendant that you're considering indeed committed the first offence, the possession, the conspiracy to possess with intent to distribute narcotics, cocaine in this case.
>      Number two, that during and in relation to the commission of that crime, that particular defendant knowingly used or carried a firearm. . . .
>      To carry a firearm means -- or to carry a firearm during and in relation to a drug trafficking crime means to move or transport the firearm on one's person or in a vehicle or in a container during and in relation to the crime.  The firearm need not be immediately accessible.
>      To use a firearm during and in relation to a crime of this kind means to employ the firearm actively, such as brandishing,

-16-

> displaying it, striking it, attempting to fire
> it.  In this case it's basically carrying it.
>      The firearm must have played some sort
> of important role in the commission of the
> offense, must have been intended by the
> defendant to play an important role in the
> commission of the offence.  And the role could
> have been protection, the role could have been
> security, whatever it may be.  Okay.

Neither defendant objected to these instructions.

## 2.  Analysis

The government does not contest that the district court erred by instructing the jury regarding "us[ing] or carr[ying]" a firearm "during and in relation to" a drug trafficking crime rather than instructing it on "possess[ing] a firearm" "in furtherance of" a drug trafficking crime.  18 U.S.C. § 924(c)(1)(A).  The government argues, however, and we agree, that there was no reversible error here.

Instructing the jury regarding "use and carry" instead of "possession" was not reversible error because "use and carry" necessarily includes possession.  A person cannot "use" a firearm without possessing it.  See Pena, 586 F.3d at 114 ("[E]ven if the jury thought it had to find 'use[]' [instead of 'possession,'] that would have been a benefit not a detriment to [the defendant].").  One also cannot "carry" a firearm without possessing it.  See United States v. Gill, 513 F.3d 836, 851 (8th Cir. 2008).

In addition, the instructions on "use" of a firearm "during and in relation to" a drug trafficking crime did not

constitute reversible error. "[W]e have understood 'in furtherance of' to demand showing a sufficient nexus between the firearm and the drug crime such that the firearm advances or promotes the drug crime. For example, we have held that possession of a firearm to protect drugs or sales proceeds can establish such a nexus." Marin, 523 F.3d at 27 (internal citations omitted). Here, the court noted that "the firearm must have played some sort of important role in the commission of the offense, must have been intended by the defendant to play an important role in the commission of the offence," and specifically gave the example cited in Marin, see id., when explaining that "the role could have been protection, the role could have been security, whatever it may be."

This circuit has noted before that "the 'in furtherance of' element of a firearm possession charge imposes a 'slightly higher standard' of liability than the nexus element corresponding to the different charges of using or carrying a firearm, which need only occur 'during and in relation to' the underlying crime." United States v. Delgado-Hernandez, 420 F.3d 16, 25 (1st Cir. 2005) (quoting H.R. Rep. No. 105-344, at 11 (1997)). We are not suggesting otherwise here. We cannot see, however, how the jury could have concluded that the firearm here played an important role in the commission of the offense without concluding that the weapon met the "in furtherance of" requirement. Thus, reviewing for plain error, we will not overturn the jury's verdict.

In light of the jury instructions described above, in convicting the defendants on the firearm charges, the jury must have concluded that the weapon was not merely present at the scene, but that it played an important role in the commission of the offense. Thus, we reject the claim that the district court's failure to give a "mere presence" instruction constituted reversible error.

Finally, we reject the defendants' coaching argument. The defendants contend that the district court improperly coached the jury when it explained that "to carry a firearm during and in relation to a drug trafficking crime means to move or transport the firearm on one's person or in a vehicle or in a container during and in relation to the crime." That this very language is part of the First Circuit's pattern jury instructions emphasizes that, rather than coaching, the district court was merely explaining in general terms the charge against the defendants. See Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 4.07 (1998).[5] The defendants also allege that the district court improperly coached the jury when it instructed that the firearm "must have played some sort of important role in the commission of the offense" and noted that "the role could have been

[5] As we have noted previously, "although pattern instructions are often helpful, their use is precatory, not mandatory." United States v. Jadlowe, 628 F.3d 1, 17 n.29 (1st Cir. 2010) (internal quotation marks and citations omitted).

-19-

protection, . . . security," or some other role.  This guidance does not constitute coaching either.  See United States v. Hernández, 490 F.3d 81, 84 (1st Cir. 2007) ("It is unquestioned that, when instructing a jury, a judge 'may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles.'" (quoting United States v. Maguire, 918 F.2d 254, 268 (1st Cir. 1990))).

## C. The Brady Claim

Gómez argues that the government committed a Brady violation by failing to provide a fingerprint analysis of the weapon found in Alverio's car.  See Brady v. Maryland, 373 U.S. 83 (1963).  The government responds that no fingerprint analysis was ever performed, and thus there cannot have been a Brady violation.[6]

"Review of the district court's decision to deny a defendant's motion for a new trial on the basis of alleged Brady violations is for manifest abuse of discretion."  United States v. Brandao, 539 F.3d 44, 64 (1st Cir. 2008).

---

[6]  The government also contends that the district court properly denied the defendant's motion under Federal Rule of Criminal Procedure 33 for a new trial because the motion was untimely. Because we resolve this issue on the merits and in favor of the government, we need not address the timeliness argument.

## 1. Background

At trial, during cross-examination by Gómez's attorney, Agent Agreló testified as follows regarding fingerprints on the weapon:

Q.   Any fingerprints were taken from the pistol?
A.   A step was taken to take fingerprints of the evidence.
Q.   Were any fingerprints taken?
A.   No.  Steps were taken, but they were not able to do the analysis.
Q.   I didn't hear your answer, sir.
A.   They were not done.  They were not performed, sir.
Q.   You do have the equipment to do that job; is that correct?
A.   Our lab, yes, sir.
Q.   You didn't feel it necessary to take the fingerprints?
A.   Like I said before, yes, sir, I requested the test for the lab.

After hearing this testimony, neither defense attorney requested a continuance in order to obtain a fingerprint analysis report for the weapon.  The Brady issue did not arise until more than ten months later, when Gómez's attorney filed an emergency motion requesting a new trial.  The motion noted that, according to Agent Agreló's testimony, fingerprinting tests of the gun were ordered but never performed, and argued that the results of such tests were exculpatory evidence and should have been disclosed pursuant to Brady.  The district court denied this motion.  Gómez now appeals the district court's determination that no Brady violation occurred.

At oral argument, we questioned counsel for the government about the possibility that a fingerprint analysis report existed. Counsel explained that she had never received notice from the government lab confirming that a fingerprint analysis report had not been completed, but that she also had never received any such report. Because the government "'has a duty to learn of any favorable evidence known to the others acting on the government's behalf,'" Moreno-Morales v. United States, 334 F.3d 140, 146 (1st Cir. 2003) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)), we requested that counsel for the government submit a proffer regarding whether or not the government lab ever produced a fingerprint analysis report on the machine gun. The proffer confirmed that no fingerprint analysis was ever conducted; the firearm was only examined for "operability."

## 2. Analysis

To establish a Brady violation, "a defendant must make three showings. 'The evidence at issue (whether exculpatory or impeaching) must be favorable to the accused; that evidence must have been either willfully or inadvertently suppressed by the government; and prejudice must have ensued.'" United States v. Mathur, 624 F.3d 498, 503 (1st Cir. 2010) (quoting United States v. Connolly, 504 F.3d 206, 212 (1st Cir. 2007)). "Although it hardly bears mention, an implicit prerequisite of any Brady claim is that favorable, material evidence actually exists." United States v.

-22-

Garvin, 270 F. App'x 141, 144 (3d Cir. 2008).  Here, because no fingerprint analysis report existed, the government did not commit a Brady violation in failing to turn over such a report.  The failure to create exculpatory evidence does not constitute a Brady violation.  See Arizona v. Youngblood, 488 U.S. 51, 59 (1988) ("[T]he police do not have a constitutional duty to perform any particular tests."); see also United States v. Nguyen, 98 F. App'x 608, 609 (9th Cir. 2004) ("Brady does not require the government to interview witnesses or otherwise create exculpatory evidence not then in existence." (citing United States v. Monroe, 943 F.2d 1007, 1011 n.2 (9th Cir. 1991))).

### III.  Conclusion

For the reasons stated, we affirm both defendants' convictions.

**Affirmed**.