# United States Court of Appeals
## For the First Circuit

Nos. 07-1663, 07-1664

EMILY MCINTYRE, AS ADMINISTRATOR OF THE ESTATE OF JOHN L.
MCINTYRE; CHRISTOPHER MCINTYRE, IN HIS CAPACITY AS CO-
ADMINISTRATOR OF THE ESTATE OF JOHN L. MCINTRYE,

Plaintiffs, Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellant/Cross-Appellee,

H. PAUL RICO; JOHN MORRIS; JOHN J. CONNOLLY, JR.; RODERICK
KENNEDY; ROBERT R. FITZPATRICK; JAMES RING; JAMES W. GREENLEAF;
JAMES AHEARN; KEVIN J. WEEKS; JAMES J. BULGER; STEPHEN J. FLEMMI;
JOHN DOE Number 1-50; FEDERAL BUREAU OF INVESTIGATION; LAWRENCE
SARHATT; JOHN V. MARTORANO; RICHARD F. BATES; JOSEPH YABLONSKY;
JAMES F. SCANLON; DENNIS F. CREEDON; THOMAS J. DALY,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Besosa,** District Judge

---

*Of the District of Puerto Rico, sitting by designation

Thomas M. Bondy, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jonathan F. Cohn, Deputy Assistant Attorney General, Steven I. Frank and Jonathan H. Levy, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellant/cross-appellee.

William E. Christie, with whom Steven M. Gordon and Shaheen & Gordon, P.A. were on brief, for appellees/cross-appellants.

October 16, 2008

**LIPEZ**, **Circuit Judge**.  This case is another chapter in the saga of the relationship between the FBI's Boston Office and two organized crime figures, James "Whitey" Bulger and Stephen Flemmi, whose unlawful, violent conduct in that city spanned three decades.  Following an eighteen-day bench trial featuring nine witnesses and thousands of pages of exhibits, the district court concluded that former FBI agent John Connolly was acting within the scope of his employment when he leaked the identity of an informant, John McIntyre, resulting in McIntyre's brutal murder by Bulger, Flemmi and their associates in the notorious Winter Hill Gang.  The court consequently awarded McIntyre's estate approximately $3.1 million in damages against the government under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346.

The government has appealed, arguing that Connolly was a rogue agent whose disclosure of McIntyre's identity violated fundamental FBI policies and was beyond any rational view of conduct falling within the scope of his employment.  We reject the government's position.  We affirm the judgment of the district court.

**I.**

The district court meticulously set out the factual background of this case, detailing the decades of history concerning Bulger's and Flemmi's involvement with the FBI in Boston and, in particular, the pair's relationship with Connolly.  See

-3-

McIntyre v. United States, 447 F. Supp. 2d 54, 62-104 (D. Mass. 2006).  Parts of that more than 40-page history also have been reported in other opinions that we have issued, including our decision affirming Connolly's conviction on charges stemming from his efforts to facilitate Bulger's and Flemmi's criminal activities and to protect them and their associates from arrest and prosecution.  See United States v. Connolly, 504 F.3d 206 (1st Cir. 2007); McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004); United States v. Connolly, 341 F.3d 16 (1st Cir. 2003).  Unable to improve on the district court's exhaustive review of the record, we provide here only a summary of the facts essential to an understanding of the scope of employment issue at the heart of this case.  However, we assume the reader's familiarity with all of the district court's factual findings, which have not been challenged by the government on appeal.  Our precis borrows liberally from the district court's well stated recitation, as well as from our own prior opinions.

**A. Connolly's Official Role with Bulger and Flemmi**

Bulger and Flemmi were informants for the FBI's Boston office at various times during a period of more than twenty-five years.  Flemmi was first recruited in 1964 and Bulger in 1971, and both men provided information off and on until 1990.  McIntyre, 447 F. Supp. 2d at 73.  They were considered particularly valuable sources for the office's high-priority investigation of the Boston

branch of La Cosa Nostra ("LCN").[1]  Although they were members of the competing Winter Hill Gang, Bulger and Flemmi frequently consorted with LCN members "and purported to transmit inside information to the FBI concerning organized crime activities in New England."  Connolly, 504 F.3d at 210.  The Boston LCN investigation proved fruitful, leading to the 1983 arrests and 1986 convictions of the leading figures of the Boston branch, Gennaro Angiulo and Illario Zannino, as well as other LCN members.  McIntyre, 447 F. Supp. 2d at 63.

Connolly, who joined the FBI in 1968, served as Bulger and Flemmi's "handler" during most of their tenure as FBI informants, beginning in 1975.  Connolly, 341 F.3d at 20; McIntyre, 447 F. Supp. 2d at 73-74.[2]  In that capacity, he met with them

---

[1] As the district court related, "[d]uring the late 1970s and early 1980s, the stated national priority of the FBI's Organized Crime Program was the takedown of Cosa Nostra."  447 F. Supp. 2d at 62 (citing Ex. 69, April 1980 Memo from Director, FBI to Attorney General, at 17) ("The majority of resources, both investigative and prosecutorial, should continue to be expended and directed against LCN, the most powerful of the organized crime groups, as it represents a greater threat to this nation than all other organized crime groups combined.").  The Boston LCN branch was likewise "the number one priority of the Organized Crime Program in the Boston Division of the FBI . . . in the 1970s and early 1980s."  Id. at 62-63 (citing, inter alia, Ex. 110, April 1981, Addendum of Supervisor Morris) ("Consistent with the national priority, the LCN is the primary target of the Organized Crime Program in the Boston Division."); see also Tr. Day 6, at 55 (Testimony of Robert Fitzpatrick, Assistant Special Agent in Charge ("ASAC") of the Boston Office, acknowledging that LCN "was the number one priority" in the office).

[2] Connolly was assigned to the Boston Office's C-3 Squad, which worked solely on organized crime, from October 1973 until

regularly and controlled other agents' access to them. Rarely did other FBI agents talk with the two men outside of Connolly's presence. See, e.g., id. at 87 (stating that Connolly served as an intermediary with Bulger and Flemmi for other agents investigating several murders); id. at 90 (noting that the Boston office rejected a request that Bulger and Flemmi be interviewed in connection with two murders "upon instructions from FBI Headquarters that no one other than Connolly" should interview them); id. at 91 (noting Agent Montanari's belief that "Bulger and Flemmi, 'as informants of an agent' would refuse to meet with him absent Connolly's intervention"); id. at 98 ("Bulger and Flemmi communicated almost exclusively with Connolly, and they refused to work with any other handler."). When Connolly retired suddenly in 1990, Bulger and Flemmi were immediately closed as informants. Id.

## B. Connolly's Collaboration with Bulger and Flemmi

At some point, the relationship between Connolly and his two informants turned illicit. A grand jury indicted Connolly in 2000 on charges of racketeering, obstruction of justice, conspiracy and making a false statement, alleging that he had provided protection, the identities of informants, and other assistance to Bulger and Flemmi in exchange for bribes and favors.[3] He was

March 1988. Id. at 64-65.

[3] Through the years, Connolly received more than $200,000 in cash and gifts from Bulger and Flemmi. 447 F. Supp. 2d at 110 (citing Flemmi's testimony, Tr. Day 2, at 98; Day 3, at 82-83).

convicted in 2002 and sentenced to 121 months in prison.[4]  We twice

rejected his appeals.  See Connolly, 504 F.3d 206; Connolly, 341

F.3d 16.

Among Connolly's misdeeds was disclosure of the names of

at least two informants, before the McIntyre episode, both of whom

were murdered by Flemmi, Bulger or their associates shortly after

the leaks.  Flemmi stated that, in December 1976, Connolly told

Bulger that a bookmaker who did business with the Winter Hill gang,

Richard Castucci, had been cooperating with the FBI.  Tr.  Day 1,

at 90-91; Ex. 3 at 7 (Agreed Statement of Facts in United States v.

Flemmi, No. 99-10371 (D. Mass. May 23, 2001)).  Castucci was shot

to death by members of the group later that month.[5]  A second

informant, Edward "Brian" Halloran, approached the FBI in early

1982 with information about the Winter Hill Gang and their possible

involvement the previous year in the murder in Tulsa, Oklahoma, of

a businessman named Roger Wheeler.[6]  Among other information,

---

[4] At the conclusion of a three-week trial, a federal jury found him guilty of one count of racketeering, two counts of obstruction of justice, and one count of making false statements. Connolly, 341 F.3d at 19.

[5] Flemmi testified that John Martorano shot Castucci in the head, and that Flemmi and Bulger disposed of the body. Tr. Day 1, at 93-94.

[6] The Winter Hill associates were, in fact, responsible for Wheeler's murder.  Flemmi and Bulger provided weapons for the killing, and Martorano shot him outside his country club in Tulsa, Oklahoma on May 27, 1981.  Tr. Day 2, at 21-22 (Flemmi testimony); Ex. 3, at 10.  Wheeler was the owner of World Jai Alai ("WJA"), a business that operated in Florida and Connecticut.  He had drawn

-7-

Halloran told Agent Leo Brunnick that Bulger and Flemmi met with Connolly on a weekly basis and that the two men "had a 'pipeline into the Boston Office.'"[7]  447 F. Supp. 2d at 83 (citing Ex. 84, Memo from Brunnick).  Sometime before May 11, 1982, Connolly told Bulger of Halloran's cooperation.  Tr. Day 2, at 34-35 (Flemmi testimony).  Bulger shot and killed Halloran and an associate, Michael Donahue, on May 11, as they were leaving a restaurant in Boston.  447 F. Supp. 2d at 86.[8]

Agents at the FBI's Boston Office and at FBI Headquarters suspected that Bulger and Flemmi were involved in the Wheeler, Halloran and Donahue murders.  447 F. Supp. 2d at 84-86.  Indeed, Halloran had told Agent Brunnick and his partner, Agent Gerald Montanari, that Bulger, Flemmi and Callahan[9] were responsible for plotting Wheeler's murder and that he, Halloran, had been paid $20,000 to keep quiet about it.  Id. at 82-83 (citing Ex. 27, Memo

---

the wrath of the Winter Hill gang by refusing to sell the business to John Callahan, who was the former president of WJA and had lost his license to operate a parimutuel betting business in Connecticut because of his relationship with "his gangster friends," including members of the Winter Hill gang.  McIntyre, 447 F. Supp. 2d at 81 (citing Ex. 3); see also Tr. Day 2, at 20 (Flemmi testimony).

[7] Brunnick's memo further states that the "pipeline" was "not necessarily Connolly" and that Halloran had "no information or indication that Connolly is furnishing any information to Stevie or Whitey."

[8] As the district court observed, Donahue's killing appears to be a classic case of being "in the wrong place at the wrong time." 447 F. Supp. 2d at 86.

[9] See supra note 6.

from McWeeney); Tr. Day 15, at 18 (Montanari testimony). He also told the agents that Martorano – the gunman – might be using Callahan's Fort Lauderdale condominium as a safe-house. Id. at 83. All of Halloran's information was passed along to FBI Headquarters. Id. at 84. Although some details of Halloran's story were investigated, "inexplicably, the Boston Office never followed up on Halloran's claim that Martorano, the reported shooter in the Wheeler murder and a federal fugitive, was hiding out at Callahan's condominium in Florida." Id. at 85.

In the last week of May 1982, meetings to discuss the Wheeler and Halloran killings took place in Washington and Boston. At the Washington meeting, agents from Boston, Miami and Oklahoma City, as well as officials from FBI Headquarters, acknowledged that Bulger and Flemmi were suspects in the cases, but a decision was made to retain them as "open" informants because the allegations against them were unsubstantiated and they were extremely valuable assets in the LCN investigation. Id. at 87 (citing Ex. 30, May 25, 1982 Memo from ASAC Fitzpatrick to Special Agent in Charge ("SAC") Lawrence Sarhatt); Tr. Day 9, at 59-60 (Fitzpatrick testimony).[10] If the suspicions had been confirmed, agency policy would have

---

[10] Fitzpatrick testified that, despite his view that Bulger, at least, should be closed as an informant, "everyone at headquarters thought he should remain open" because "he was too valuable."

prevented their retention as informants without authorization from the highest levels of the FBI and Justice Department.[11]

At a follow-up meeting two days later in Boston, Connolly – who had not been at the meeting in Washington – was informed that Bulger and Flemmi were the focus of the investigation into the Wheeler and Halloran murders. He argued that they were not involved. It was agreed that the agents investigating the murders would not directly interview Bulger and Flemmi, and would rely instead on Connolly acting as an intermediary. 447 F. Supp. 2d at 87.

Two months later, Callahan also was dead. Connolly had told Bulger in July that the FBI was looking for Callahan to question him in connection with the Wheeler murder. Tr. Day 2, at

---

[11] The FBI's rules regarding the handling of informants, contained in Section 137 of the agency's Manual of Investigative Operations and Guidelines ("MIOG"), required supervisors to make written findings on the "suitability" of an individual to serve as an informant. Ex. 6, § 137-17(1) (Attorney General's Guidelines on FBI Use of Informants and Confidential Sources, Part D(1)(1981)). Although the Guidelines allow use of informants who are involved in criminal activity, the crimes must not be "of a serious nature." 447 F. Supp. 2d at 68 (citing Guidelines at Part G(2)). If a field office learned that an informant had participated in a "serious act of violence," it was required to notify FBI Headquarters and only the Director or a "senior Headquarters official" could approve the continued use of such an informant – after consultation with the Assistant Attorney General in charge of the Criminal Division. Id. at 69-70 (citing Guidelines at Part G(3)). Throughout their tenure as informants, Flemmi and Bulger were "closed" – i.e., terminated as informants – and re-opened multiple times. Id. at 74 n.35 (giving a chronology of Bulger's and Flemmi's openings and closings as informants between 1964 and 1990). At least with respect to Flemmi, a closing had little effect; he was treated as an informant regardless of his official status. Id. at 74.

37 (Flemmi testimony).  According to Flemmi, Connolly also told Bulger that "Callahan was a weak link who would not be able to withstand the pressure of an FBI interrogation."  447 F. Supp. 2d at 88.  Bulger and Flemmi concluded that Callahan needed to be killed.  Their usual hit man, Martorano, assisted by another Winter Hill member, Joseph McDonald, killed Callahan at Fort Lauderdale International Airport on August 1, 1982.  Id. at 87 (citing Tr. Day 2, at 40-41, Flemmi testimony).[12]

The FBI's recognition of the apparent link between the Winter Hill gang and three murders – Wheeler's, Halloran's and Callahan's – was reported in a November 1982 memo sent by the Chief of the FBI's Organized Crime Section, Sean McWeeney, to Associate Deputy Director Oliver Revell.  The memo stated that "there is evidence [the murders] were committed by an organized crime group in Boston, Massachusetts, the Winter Hill gang."  Id. at 88 (citing Ex. 121, at 1).  James Greenleaf, who became the SAC of the Boston Office on November 29, 1982, was among those copied on the memo, which was generated at FBI Headquarters in Washington.

By the time of that memo, Flemmi – but not Bulger – had been closed as an informant.  Officially, the reason for the

---

[12] Martorano picked up Callahan at the airport and shot him in the back of the head after he entered Martorano's car.  Martorano and McDonald transferred the body to the trunk of Callahan's car, where it was discovered after a parking attendant noticed blood dripping from the vehicle.  447 F. Supp. 2d at 87 (citing Tr. Day 2, at 40-41, Flemmi testimony).

-11-

closing was his possible implication in criminal activity unrelated to the murders. However, internal communications in the Boston Office indicated that the murder investigation prompted his change in status. 447 F. Supp. 2d at 88 n.59. Despite his closing, Flemmi continued to provide significant information to the FBI throughout the period until he was re-opened in early July 1986. Meanwhile, Bulger remained open and, in February 1983, while the murder investigations were ongoing, he was designated a "Top Echelon" informant, meaning that he was expected to provide information about management-level activity of an organized crime group. Id. at 66. Eventually, the murder investigation wound down without a contemporaneous resolution, despite the forty or so volumes of files that had been produced on the crimes. Tr. Day 13, at 96, 108 (Montanari testimony).[13]

## C. FBI Knowledge of Connolly's Conduct

In its closing argument before the district court, the government asserted that Bulger and Flemmi were not indicted in connection with the murders and other criminal activity until 1995 because they were "very, very smart, and very, very cognizant of

---

[13] Following an indictment in 1995, Flemmi pled guilty in 2003 to racketeering acts that included the Castucci, Wheeler, Callahan and McIntyre murders. Another Winter Hill member, Kevin Weeks, pled guilty to racketeering acts that included aiding and abetting the Halloran, Donahue and McIntyre murders. 447 F. Supp. 2d at 59-60 nn.5 & 6. Bulger, who was charged with similar crimes, has been a fugitive since the indictment was issued. See Connolly, 504 F.3d at 210.

everything that was going on around them." Tr. Day 18, at 121.

However, considerable evidence supports the district court's view that their awareness was not solely attributable to their own skills and acuity. Other law enforcement representatives had expressed concern about the Boston Office's "too-close association" with members of Winter Hill. 447 F. Supp. 2d at 89. In a meeting with FBI Headquarters representatives in November 1982, Florida state and local law enforcement members who were responsible for investigating the Callahan murder reported that they were reluctant to provide information to the Boston Office because they believed the Winter Hill connection had been hindering that office's investigation into the murders. Id.[14] The concerns from Florida were relayed in a memo from Organized Crime Chief McWeeney to Associate Deputy Director Revell:

> Inferences could be drawn from conversations indicating that these state and local officials were of the opinion that the FBI had confidential informants within the Winter Hill organization and because of this their efforts against this group were curtailed. In fact, FBI Boston has previously utilized two suspects in this matter as organized crime sources in the Boston Division.

---

[14] The Florida representatives also were troubled by the association between personnel in the FBI's Miami Office and a former Boston Office agent, H. Paul Rico, who at the time of the murders was working as head of security at World Jai Alai. 447 F. Supp. 2d at 89. In 1969, Rico had warned Flemmi that he was about to be indicted, enabling Flemmi to become a fugitive for five years. Flemmi testified that he returned to Boston in 1974 after Rico told him he would be protected from prosecution. Id. at 78-79; see Tr. Day 2, at 71-75 (Flemmi testimony).

-13-

Ex. 121, at 6; see also id. at 3 (noting the belief of law enforcement agencies in Miami that "some Agents in the Boston FBI would not pursue allegations against the Winter Hill gang vigorously").

In addition to these hints that the Boston Office was protecting Bulger and Flemmi from murder charges, the FBI had been told explicitly by Halloran that someone in the office was leaking information to them. In his testimony, Flemmi confirmed that Connolly reported to him and Bulger on the progress of the murder investigation, Tr. Day 3, at 71-72, as well as on a 1984 investigation by the Drug Enforcement Administration into suspected drug activity by Bulger and Flemmi, id. at 23.[15] The district court also found that "there had long been allegations of leaks by Connolly from the Massachusetts State Police." 447 F. Supp. 2d at 95 n.71.

Despite the concerns from various sources that Connolly was improperly disclosing information to Bulger and Flemmi, he consistently received one of the FBI's top two ratings for his overall performance and his handling of informants throughout the period from 1978 to 1987. Id. at 96. On one occasion, Connolly's then-supervisor, Agent James Ring, was chastised by an inspector

---

[15] The DEA investigation did not produce results even though Bulger and Flemmi were involved in drug trafficking from approximately 1981 to 1990. 447 F. Supp. 2d at 94 (citing Tr. Day 2, at 62-63 (Flemmi testimony)). They eventually were indicted for their drug activity in 1995.

from FBI Headquarters for rating Connolly "superior" rather than "exceptional."  Id. at 97.  In a memo to the Special Agent in Charge of the Boston Office, Inspector Bob Reutter stated that he considered "'the contributions made by SA [Special Agent] Connolly as crucial to the overall OC [Organized Crime] program and substantial in terms of the results achieved.'"  Id. (quoting Ex. 55w, Memo of July 8, 1987).  Connolly was repeatedly recommended for salary increases and monetary awards on the basis of his performance,[16] and he was asked by FBI Headquarters to instruct other federal agents on the development and handling of informants. Id.  In 1988, he became the Organized Crime Drug Enforcement Task Force Coordinator in the Boston Office.  Id.

**D. McIntyre's FBI Involvement and Murder**

McIntyre's relationship with the FBI's Boston Office began in the fall of 1984, shortly after the United States Customs Service seized a ship, the *Valhalla*, on which he was serving as a

---

[16] In a Performance Appraisal Report covering the period from November 15, 1981 through November 12, 1982 – during which Halloran and Callahan were killed – Connolly was praised for "develop[ing], maintain[ing], and operat[ing] a corps of extremely high level and productive informants."  Ex. 55e.  The Report continued: "His direction and their resultant information has brought about results exceeded by none in the Boston Division's Organized Crime Program. . . . His performance has been at the level to which all should aspire to attain but few will realistically reach."  A memo from the Boston Office to the Director of the FBI in August 1981 stated that Connolly "currently operates . . . high-placed informants furnishing information on Organized Crime in the New England area and has significantly contributed toward the achievement of the OC Squad goals and objectives especially through his skillful direction of high-quality informants."  Ex. 55h.

crew member. The *Valhalla* had just returned from Ireland, where it had delivered an illegal cargo of weapons and ammunition for the Irish Republican Army ("IRA"). McIntyre, one of two crew members on board, had already been cooperating with agents of the Drug Enforcement Agency ("DEA"),[17] and the next day, October 17, 1984, he met with a Customs agent, Philip Brady, and two FBI officers, Roderick Kennedy and George Bertram. Brady and Kennedy were members of the Drug Task Force, which consisted of representatives from Customs, the IRS and the FBI. Bertram was present at the meeting because he covered the IRA for the FBI. 447 F. Supp. 2d at 99.

During the meeting, McIntyre discussed an upcoming drug shipment that was expected by Murray, whom customs already knew paid "tribute" – a fee – to Bulger so that he could safely operate his drug smuggling operation in South Boston.[18] Id. McIntyre confirmed the Murray-Bulger connection, reporting that "'an individual named Whitey [a Bulger nickname] who operates a liquor store in South Boston became partners with Joe Murray.'" Id. at 100. McIntyre was released after he agreed to cooperate with Customs and the FBI in the ongoing investigation into Murray's drug

---

[17] McIntyre was working at the time for Joe Murray, another Boston crime figure who was involved in drug and weapons smuggling.

[18] Bulger and Flemmi collected "rent" or tribute from other criminals as payment for the privilege of conducting activity within territory controlled by them. Id. at 94 n.69.

activities. On the basis of information he provided, the combined law enforcement agencies seized Murray's next drug load on a ship, the *Ramsland,* as it entered Boston Harbor in mid-November 1984. McIntyre was on board as a member of the "substitute crew" that had replaced the ship's English crew at the mouth of the harbor. The ship was carrying thirty tons of marijuana, and Flemmi testified that he expected to receive $1 million from the shipment's sales proceeds. Kevin Weeks, another Winter Hill member, testified that he, Bulger and Flemmi each were to receive $3 million.

After the *Ramsland* was seized, McIntyre reported to Brady that Murray suspected someone in the substitute crew of cooperating with law enforcement. McIntyre did not feel that he was in danger, and Brady also assumed McIntyre was not at risk because there had been no apparent change in his relationship with Murray. Id. at 101. On November 22, a few days after the *Ramsland*'s seizure, McIntyre reported to Brady that Pat Nee, a Bulger associate, had offered him the opportunity to invest $20,000 in a drug smuggling venture. Id. In reality, the "offer" was a ruse designed to lure McIntyre to meet with Bulger and Flemmi. Id. at 102. Customs provided McIntyre with the money, and McIntyre delivered it to Nee on November 29. The next day, Nee brought McIntyre to a house in South Boston, where McIntyre had expected a social gathering. Instead, Flemmi and Bulger confronted him with their suspicion that he had been cooperating with Customs. After securing McIntyre's

confession of his complicity with law enforcement, Bulger made an unsuccessful attempt to strangle him, and then shot and killed him. Id. at 102-104. Fifteen years later, on January 14, 2000, Weeks led authorities to McIntyre's makeshift grave.[19]

Bulger and Flemmi learned that McIntyre was an informant from Connolly, who had disclosed that one of the two individuals taken off the *Valhalla* was cooperating with law enforcement. Although Connolly did not identify McIntyre by name, the information he conveyed was sufficient to reveal his identity to Bulger and Flemmi, who knew that McIntyre had been one of the two people on the ship.

**E. The FTCA Litigation**

The relationship between the Winter Hill gang and the Boston Office of the FBI was publicly exposed in 1999 in a lengthy opinion issued by Judge Mark Wolf of the Massachusetts District Court in United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999), rev'd in part, 225 F.3d 78 (1st Cir. 2000).[20] In his

---

[19] McIntyre originally was buried in the basement of the house where he was killed, next to another Bulger-Flemmi murder victim, Arthur Barrett. See Barrett v. United States, 462 F.3d 28, 30 (1st Cir. 2006). A third victim, Deborah Hussey, was murdered and buried in the house in early 1985. The remains of all three were removed on Halloween night in 1985, when it appeared that the house was about to be sold, and they were re-buried in Dorchester. 447 F. Supp. 2d at 104 n.88.

[20] Francis Salemme was an associate of Bulger and Flemmi, and he was indicted with them and others in January 1995 for varied organized crime activities. Judge Wolf presided over the complex proceedings in that case. The opinion cited above reviewed the

-18-

decision, Judge Wolf outlined a possible pattern of corruption involving Bulger, Flemmi, Connolly and at least one of Connolly's FBI supervisors, John Morris. Judge Wolf speculated in his opinion that Connolly may have disclosed McIntyre's identity to Bulger and Flemmi. Id. at 213; see also McIntyre v. United States, 367 F.3d 38, 40 (1st Cir. 2004).

Five months later, in January 2000, McIntyre's body was recovered. On May 25, 2000, McIntyre's estate, through its administrator (McIntyre's mother, Emily McIntyre) and co-administrator (his brother, Christopher McIntyre),[21] filed this action against the United States under the Federal Tort Claims Act.[22] The statute provides that the United States may be sued for money damages for personal injury or death caused by the negligent or otherwise wrongful acts or omissions of its employees while acting within the scope of their office or employment. 28 U.S.C.

---

background of Flemmi's and Bulger's relationship with the FBI, describing many of the same incidents detailed in the district court's opinion in this case. Much of the analysis in Judge Wolf's opinion was devoted to Flemmi's motions to dismiss the charges against him and to suppress statements he had made to the FBI based on FBI promises of immunity.

[21] For convenience, we at times will refer to the plaintiffs in this case as McIntyre.

[22] McIntyre also asserted claims against Bulger, Flemmi, Weeks and eight former agents of the Boston Office of the FBI, including Connolly. The district court bifurcated the trial of the claims against the United States from the trial of the individual claims, and only the case against the government is before us.

§ 1346.[23] The McIntyre claim was premised on multiple theories: (1) that the FBI directly caused McIntyre's death when Connolly informed Bulger and Flemmi that McIntyre was cooperating with authorities, foreseeably leading to his murder, (2) that the agency indirectly caused his death through the protection its agents afforded Bulger and Flemmi, which encouraged and enabled them to commit murders, including McIntyre's, and (3) that other agents negligently supervised Connolly, failing to take corrective action even though they knew or should have known that Connolly was leaking information to Bulger and Flemmi and protecting them from investigation, arrest and prosecution. McIntyre, 367 F.3d at 41; McIntyre, 447 F. Supp. 2d at 59. The claims proceeded to trial on June 5, 2006.[24]

---

[23] The FTCA is a limited waiver of the federal government's sovereign immunity, granting federal courts jurisdiction over claims that fall within its scope. These include claims

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

[24] The district court had granted the government's motion to dismiss McIntyre's action as untimely on the ground that the prerequisite administrative claim was not filed within two years of accrual, as required by the FTCA, 28 U.S.C. § 2401(b). We reversed the dismissal and remanded after concluding that the factual predicate for McIntyre's claims could not reasonably have been known earlier. See McIntyre, 367 F.3d at 56-57.

On September 5, 2006, the district court issued its comprehensive decision in favor of the plaintiffs, reaching only the first of McIntyre's theories of liability. The court found the United States responsible for McIntyre's death "because Connolly, acting within the scope of his employment, disclosed information to Bulger and Flemmi sufficient for them to identify McIntyre as a government informant, and McIntyre's death was a foreseeable consequence of that disclosure." 447 F. Supp. 2d at 60. As noted above, the court awarded McIntyre's estate approximately $3.1 million in damages.[25]

## II.

An FTCA suit may be brought only if the conduct on which the action is based would support a cause of action against a private person under "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006). In this instance, the applicable state law is the Massachusetts wrongful death statute, which allows recovery for deaths caused by negligence. Mass. Gen. Laws. ch. 229, § 2; see also Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998).

---

[25] The damages consisted of $3 million for McIntyre's conscious suffering during the few minutes that Bulger attempted to strangle and then shot him, $100,000 for his mother's loss of consortium, and $1,876 in funeral and burial expenses.

-21-

To succeed with such a claim under the FTCA, the plaintiff must satisfy the state's standard for tort liability. Mitchell, 141 F.3d at 13. Under Massachusetts law, "a tort plaintiff must show that (1) the defendant owed him a duty, (2) the defendant breached that duty, (3) the breach constituted a proximate cause of the ensuing harm, and (4) the breach caused actual injury." Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000); see also McCloskey, 446 F.3d at 267; Jupin v. Kask, 849 N.E.2d 829, 834-35 (Mass. 2006).

In its appeal of the district court's ruling, the United States presents a narrow challenge:[26] it claims that the court erred only in concluding that Connolly's leak of McIntyre's identity fell within the scope of his employment for the FBI, the prerequisite to liability against the United States under the FTCA. See 28 U.S.C. § 1346(b)(1) (providing recovery "for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment"). The government does not take issue with the court's findings on the state-law elements of the FTCA claim: that Connolly had a duty to protect McIntyre from harm at the hands of Bulger and Flemmi because of his informant status, id. at 106-108, that

---

[26] Both parties also have appealed, on different grounds, the calculation of post-judgment interest on the damages award. Neither party disputes the assertion of the other, and we therefore touch on that issue only briefly in Section III below.

disclosure of McIntyre's identity as an informant breached that duty, id. at 108, and that McIntyre's murder was a foreseeable risk of that disclosure, id. at 111. Accordingly, we confine our discussion to the scope of employment question.

## A. Legal Principles

Whether an employee is acting within the scope of his employment for purposes of the FTCA is determined by the law of the state in which the relevant conduct occurred. Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996). Under Massachusetts law, an employee's conduct is within the scope of his or her employment if (1) it is of the kind the employee was hired to perform, (2) it occurs within "authorized time and space limits," and (3) "'it is motivated, at least in part, by a purpose to serve the employer.'" Pinshaw v. Metro. Dist. Comm'n, 524 N.E.2d 1351, 1356 (Mass. 1988) (quoting Wang Labs., Inc. v. Business Incentives, Inc., 501 N.E.2d 1163, 1163 (Mass. 1986)); see also Clickner v. City of Lowell, 663 N.E.2d 852, 855 (Mass. 1996).

The scope of employment "is not construed restrictively," Howard v. Town of Burlington, 506 N.E.2d 102, 105 (Mass. 1987); see also Commonwealth v. Jerez, 457 N.E.2d 1105, 1108 (Mass. 1983),[27]

_____

[27] In Jerez, the court observed:

We long have recognized that acts not strictly necessary for fulfilment of an agent's duties nonetheless may fall within the agent's scope of employment. The scope of an agent's authority is not construed restrictively in this Commonwealth, and on several occasions we have considered

-23-

and it may extend beyond the employee's explicit authority, Howard,
506 N.E.2d at 105.  "[I]t is ordinarily the actual and customary,
rather than formally described, duties which determine scope of
employment."  Id. at 105-106.  In elaborating on the employer's
responsibility for unauthorized acts, the Massachusetts Supreme
Judicial Court observed:

> "If the act complained of was within the scope
> of the servant's authority, the master will be
> liable, although it constituted an abuse or
> excess of the authority conferred.  The master
> . . . is justly held responsible when the
> servant, through lack of judgment or
> discretion, or from infirmity of temper, or
> under the influence of passion aroused by the
> circumstances and the occasion, goes beyond
> the strict line of his duty or authority and
> inflicts an unjustifiable injury on a third
> person."

Pinshaw, 524 N.E.2d at 1356 (quoting Kent v. Bradley, 480 S.W.2d
55, 57 (Tex. Civ. App. 1972)).  We also have recognized that a
principal may be responsible for conduct customarily within its
agent's scope of employment "'even though it is established fact
that the act was forbidden by the principal.'"  United States v.
Potter, 463 F.3d 9, 26 (1st Cir. 2006) (quoting Harold Reuschlein
& William Gregory, The Law of Agency and Partnership 167 (1990));
see also Restatement (Second) of Agency § 230 ("An act, although

---

whether an intentional tort committed by an agent was
performed within the scope of his employment.

457 N.E.2d at 1108 (citations omitted).

-24-

forbidden, or done in a forbidden manner, may be within the scope of employment.").[28]

The Restatement lists a number of factors to consider in determining whether unauthorized conduct is sufficiently similar or incidental to authorized conduct to be within the scope of employment, including whether the employer "has reason to expect that such an act will be done," "the similarity in quality of the act done to the act authorized," "the extent of departure from the normal method of accomplishing an authorized result," and "whether or not the act is seriously criminal." Restatement (Second) of Agency, § 229 (2)(f), (g), (i), (j).[29] As with forbidden acts, criminal acts are not automatically outside the scope of employment. See Restatement (Second) of Agency § 231.

---

[28] The Restatement illustrates the "forbidden act" principle by giving the example of a gun salesman who has been directed never to insert a cartridge while exhibiting a gun. A salesman who violated the directive would nonetheless be acting within the scope of his employment. Restatement (Second) of Agency § 230, illus. 1 (1958); see also Potter, 463 F.3d at 26 n.10 (describing Restatement illustration). We note that Massachusetts courts routinely rely on the Restatement in examining scope-of-employment questions. See, e.g., Clickner, 663 N.E.2d at 855; Pinshaw, 524 N.E.2d at 1356; Howard, 506 N.E.2d at 106; Wang, 501 N.E.2d at 1166-67.

[29] The other relevant factors listed in § 229(2) are: whether the act is commonly done by such employees; the time, place and purpose of the act; the previous relations between the employer and employee; the extent to which the employer's work is apportioned among different employees; whether the act is outside the employer's business or has not been entrusted to any employee; and whether the instrumentality by which the harm is done has been furnished by the employer.

-25-

**B. The District Court Decision and the Standard of Review**

The district court concluded that Connolly's leak of McIntyre's identity to Bulger and Flemmi was within the scope of his employment as an FBI agent because "[t]he management of informants was both a formal job requirement and an actual and customary duty of FBI agents," 447 F. Supp. 2d at 108, and communicating with informants was the "'kind of conduct [Connolly] was employed to perform,'" 447 F. Supp. 2d at 109 (quoting Wang, 501 N.E.2d at 1166). In explaining its conclusion, the court cited, inter alia, Connolly's long relationship with Bulger and Flemmi and his responsibility to obtain information from them, which required Connolly to "maintain his relationship with them and cultivate their goodwill." Id. The court also noted the decades of protection afforded to Bulger and Flemmi by the FBI, reflecting their high value to the agency, and it pointed as well to the agency's repeated endorsement of Connolly's handling of informants. Id.

In discussing the third prong of the Massachusetts test – motivation – the court began by explicitly crediting Flemmi's testimony that he and Bulger gave Connolly in excess of $200,000 between 1981 and 1990. Id. at 110. The court acknowledged Connolly's personal interest in keeping Bulger and Flemmi happy, and found that the leak about McIntyre's identity was partially motivated by greed and the desire to maintain his friendship with

-26-

the two men.  Id. at 111.  However, the court also found that he was "motivated, at least in part, by a desire to promote the FBI's goal of taking down Cosa Nostra through the use of Bulger and Flemmi as informants."  Id.

We review the scope of employment determination de novo. Aversa, 99 F.3d at 1210.  The underlying factual findings, including the court's determination of Connolly's motive, are reviewed for clear error.  See Reyelt v. Danzell, 533 F.3d 28, 31 (1st Cir. 2008) ("[T]he [district] court's factual findings are reviewed only for clear error . . . .");  Aversa, 99 F.3d at 1212-13 (noting that district court "justifiably could find" that employee intended, "at least in part and although misguidedly, to serve an objective of his employer").

## C. Discussion

The government argues that the United States may not be held responsible for McIntyre's death because Connolly "departed in [] an extreme fashion from any recognized boundary of the employment concept . . . , committ[ing] the most fundamental and heinous betrayal of his job."  In the government's view, Connolly's action was "the opposite of the scope of employment."  In the terms of the multi-prong framework of Massachusetts law, the United States maintains that leaking McIntire's identity was neither the

kind of conduct Connolly was hired to perform (prong one) nor motivated by a purpose to serve the FBI (prong three).[30]

In support of its view, the government cites numerous ways in which Connolly's action was at odds with the FBI's interests. It emphasizes that the leak of an informant's identity is contrary to explicit FBI policy,[31] it violated Connolly's Employment Agreement with the FBI,[32] and such a disclosure would jeopardize the agency's continuing ability to recruit informants – who are a crucial tool in the FBI's investigatory efforts. The government additionally characterizes Connolly's leak of McIntyre's identity as a form of theft or embezzlement that he committed in exchange for the money and other gifts provided by Bulger and

---

[30] Prong two – requiring that the conduct occur "within authorized time and space limits" – warrants little discussion. There is no dispute that Connolly was the handler for Bulger and Flemmi when he disclosed McIntyre's identity, and his job was not confined to specific hours or locations. Consequently, prong two is easily satisfied.

[31] The FBI's Manual of Investigative Operations and Guidelines cautioned that agents must take care in handling informants "to insure that they are not provided any information other than that necessary to carry out their assignments." See Ex. 6, Guidelines, § 137-3(8) (1978).

[32] The agreement that Connolly signed acknowledges his understanding that "unauthorized disclosure of information in the files of the FBI or information I may acquire as an employee of the FBI could . . . prevent the FBI from effectively discharging its responsibilities," and he agreed never to "divulge, publish, or reveal either by word or conduct . . . to any unauthorized recipient without official written authorization by the Director of the FBI or his delegate, any information from the investigatory files of the FBI . . . or disclose any information . . . acquired as a part of the performance of my official duties."

Flemmi, and it argues that taking bribes to steal from an employer can never constitute conduct within the scope of employment.

As to motivation, the government highlights Connolly's conviction for collaborating with Bulger and Flemmi, and argues that the McIntyre leak was motivated solely by his desire to further their joint criminal enterprise and to protect them from prosecution. The government argues that there is no evidence that Connolly's revelation of McIntyre's identity was in any way intended to further the interests of the FBI; rather, it was in keeping with other acts of betrayal that he committed to advance his personal interests at the expense of the FBI and its mission.

Connolly's role as Bulger's and Flemmi's handler cannot, the government insists, place all of his interactions with them within the scope of his employment. Protecting them at any cost – and facilitating McIntyre's murder – was not the sort of conduct he was hired to perform. The government's view is perhaps best summarized by its statement at oral argument that, by the time of the McIntyre leak, "this guy [had] crossed to the other side; he was a criminal who had a day job as an FBI agent."

We understand the government's perspective. Connolly took advantage of his law enforcement status to form a corrupt relationship with Bulger and Flemmi. As a general matter, disclosing an informant's identity to violent criminals who have a penchant for murdering people whom they consider a threat seems far

-29-

outside the range of conduct Connolly was employed to perform. The McIntyre leak violated a bright-line law enforcement rule that informant identity never be revealed, and put at risk the life of an individual who was helping the FBI. There is some appeal in the government's position that such conduct is categorically outside the scope of an FBI agent's employment and that, consequently, it could only be motivated by Connolly's desire to advance his lucrative, unlawful second "career."

The government's depiction of the case, however, fails to acknowledge its extraordinary context. The factors it lists in arguing that Connolly's disclosure of McIntyre's identity fell outside the scope of his employment – including the contractual and policy prohibitions on leaks, the "'seriously criminal'" nature of his action, and its "extreme 'departure from the normal method of [handling informants],'" Reply Brief at 8 (quoting Restatement (Second) of Agency, § 229(2)(j),(i)) – paint Connolly as a lone renegade whose outrageous, unprecedented behavior could not have been anticipated by his superiors. This assessment of Connolly's conduct is unduly narrow.

Although it is undisputed that Connolly had no explicit authority to disclose McIntyre's identity, we must look to his "actual and customary" duties to determine if the leak may be considered within the scope of his employment. Howard, 506 N.E.2d at 105-106; see also Potter, 463 F.3d at 26;. As we shall explain,

we agree with the district court that Connolly's disclosure was within the boundaries of the FBI's longstanding method of handling Bulger and Flemmi through Connolly, and that it consequently is "'just'" to treat the harm caused by the disclosure "'as one of the normal risks to be borne by the business in which the servant is employed,'" Croes v. United States, 726 F.2d 31, 32-33 (1st Cir. 1984) (quoting Restatement (Second) of Agency, § 229 (cmt. a)).

1.  Prong One: Kind of Employment

The FBI as an institution had selected La Cosa Nostra as its highest priority, and it correctly viewed Bulger and Flemmi as uniquely effective tools in dismantling Winter Hill's organized crime competitor.  As a result, the two men received kid-glove treatment from all levels of the FBI for decades.  The district court recounts in great detail that suspicions about Bulger's and Flemmi's involvement in serious crimes were repeatedly left unexplored or were pursued minimally, and the FBI routinely departed from the agency's regulations when working with them – presumably to assure that they would remain available to provide critical LCN intelligence.

Examples of this deferential handling of Bulger and Flemmi abound in the record.  They include judgments made by Headquarters personnel as well as by supervisors in the Boston Office.  Among them are the following, some of which we previously have described in more detail:

(1) Bulger and Flemmi were removed from a 1979 indictment charging a scheme to fix horse races, and listed only as unindicted co-conspirators, after a request by Connolly and his then-supervisor, John Morris, because of their value to the LCN investigation. 447 F. Supp. 2d at 80;[33]

(2) At the Washington and Boston meetings in May 1982, high level FBI officials decided to retain Bulger and Flemmi as open informants despite suspicions about their roles in the Wheeler and Halloran murders. Id. at 87;

(3) In response to a 1983 request from the Oklahoma City Office of the FBI that Bulger and Flemmi's informant files be examined for reports of activity around the time of the Wheeler and Callahan murders, Connolly wrote a report – two years after the Wheeler murder and a year after Callahan's – establishing alibis for Bulger for both dates. Connolly's supervisors apparently accepted the report without questioning its delay, despite Connolly's conspicuous violation of FBI guidelines requiring a much prompter report under the circumstances. Id. at 90-91;[34]

---

[33] At the time, neither Bulger nor Flemmi was officially open as an informant. 447 F. Supp. 2d at 80.

[34] The district court found that Connolly discussed the alibi for the Wheeler death with Bulger shortly after the murder, telling Bulger that if he were implicated in the killing, Connolly would say that he and Bulger had spoken by telephone the night of the murder and that Bulger was in Boston, not in Oklahoma City, at that time. The memo Connolly prepared two years later provided just such an alibi. 447 F. Supp. 2d at 82 (citing Ex. 111, Memo from Connolly to SAC). The Manual of Investigative Operations and

(4) When Bulger and Flemmi eventually were interviewed about the murders following an inquiry from the Tulsa Police Department, they were interviewed together at the pair's insistence, contrary to standard procedures. Id. at 91;

(5) The Boston Office files contained many references to Bulger's and Flemmi's involvement between 1965 and 1987 in loansharking and bookmaking, crimes that should have triggered investigations into their suitability to remain informants. Id. at 76-78 & n.41. Even during periods when Flemmi was closed as an informant, he was treated as an informant, and during one closed stretch in 1983, an agent who wanted to interview him approached him through Connolly. Id. at 74 (citing Tr. Day 13, at 105-107, Montanari testimony);[35]

(6) James Greenleaf, the SAC of the Boston Office from November 1982 through October 1986, testified that investigations of Bulger and Flemmi by other law enforcement agencies "just didn't register" with him. This lack of attention to the growing evidence

Guidelines requires that contacts with informants be recorded in the informant's file at or near the time they occurred. Ex. 6, Guidelines § 137-8(1) (1981) ("All information pertinent to our investigative responsibilities furnished by informants must be promptly reviewed, recorded, indexed, evaluated, channelized, and all other necessary action taken.").

[35] The continuity of the relationship violated FBI guidelines. The MIOG requires that, when an informant is closed because he is "no longer suitable to provide information or operational assistance, his relationship with the Bureau shall be promptly terminated." Ex. 6, § 137-17, Guidelines Part D(7).

of the pair's involvement in serious criminal activity allowed him to avoid meaningful suitability reviews of their status.  See Tr. Day 14, at 104.[36]

Although the United States asserts that Bulger and Flemmi escaped prosecution and retained their informant status, sometimes unofficially, because none of the FBI's suspicions were validated by concrete evidence, the record supports the district court's observation that "the FBI was not pounding the pavement looking for evidence that could 'stick.'  Instead, the FBI stuck its head in the sand when it came to the criminal activities of Bulger and Flemmi."  447 F. Supp. 2d at 93.[37]  Indeed, the deference paid to Bulger and Flemmi did not go unnoticed by the two men.  Flemmi

---

[36] Greenleaf testified that a suitability review should be conducted in response to reports of serious criminal activity, but no suitability review was conducted for Bulger and Flemmi during his tenure as SAC of the Boston Office.  Tr. Day 14, at 53-54.  He stated that he had received no report that they were involved in such activity.  Id.

[37] Soon after Fitzpatrick arrived in the Boston Office in 1981, he met with Bulger and subsequently recommended to Lawrence Sarhatt, the SAC of the Boston Office from 1980 until November 1982, that he be closed as an informant.  Fitzpatrick thought Sarhatt agreed with him:

> I felt . . . that he went along with it.  But whatever happened thereafter, there were other intervening cases, LCN, and so forth that intruded, and we went on with other stuff.

Tr. Day 8, at 17.  However, when Fitzpatrick made the same recommendation to McWeeney, the FBI's Organized Crime Chief, McWeeney "started telling me how valuable Mr. Bulger was."  Id. at 21.  Fitzpatrick understood that it was a Headquarters decision to keep Bulger open.  Id. at 25.

testified that the agents in the Boston Office treated him and Bulger like colleagues, "'like we were FBI agents.'"  Id. at 91 n.65 (quoting Tr. June 6, 2006, at 93-94).

Moreover, Connolly's disclosure of McIntyre's identity was neither his first nor only leak of sensitive information, and the FBI repeatedly was told of concerns that Connolly was a source of leaked information.  In December 1976, Connolly learned that Castucci had provided information to the FBI about the whereabouts of two Winter Hill members.  He told Bulger, who promptly arranged Castucci's murder.  Id. at 79.  The Boston Office received information from more than one source that Bulger and Flemmi had killed Castucci, id., but apparently never asked Connolly if he knew anything about the circumstances of the murder, id. at 80 n.44.

We previously have described the concerns expressed by local law enforcement authorities in Massachusetts and Florida concerning leaks from the Boston Office and from Connolly in particular.  Although this knowledge of local concerns went to the highest levels of the FBI, the record shows no meaningful follow-up, even after Halloran's explicit report that someone in the Boston Office was leaking information to Bulger and Flemmi.  Id. at 83 & n.49;[38] see also id. at 95 n.71 (noting the concerns "as early

---

[38] At trial, Agent Montanari testified that, despite Halloran's report about a leak in the Boston Office during the time he was investigating the murders, he did not believe anyone in the office

as 1982 that Bulger and Flemmi might be obtaining information concerning investigations of their criminal activities from the Boston Office itself"); Tr. Day 9, at 39-40 (Fitzpatrick testimony). Fitzpatrick testified that he was informed by SAC Sarhatt upon Fitzpatrick's arrival in Boston in 1981 that Connolly and his supervisor, Morris, might have leaked information to Bulger and Flemmi that compromised an investigation by state law enforcement authorities. Tr. Day 7, at 61. Fitzpatrick also had been told by FBI Assistant Director McKinnon, who was based at FBI Headquarters, that there were problems in the Boston Office. Asked at trial if he investigated whether Connolly was "the pipeline" for Bulger and Flemmi, Fitzpatrick responded that "[i]t wasn't part of the purview at that time. That was not part of the investigation at that time." Tr. Day 9, at 40.

Greenleaf, the SAC beginning in November 1982, testified that he was not focused on the reports that Bulger and Flemmi had sources within law enforcement generally or within the FBI, although he was concerned that they were receiving information about investigations into their activities. Tr. Day 14, at 119. He knew of no investigation being conducted in response to those reports. Id.

_____

was improperly disclosing information. Tr. Day 13, at 110. He said he did not give "any credence" to rumors from other police agencies expressing distrust of Connolly. Id.

Instead, as the other law enforcement departments expressed their concerns about Connolly's relationship with Bulger and Flemmi, Connolly was being highly praised by his superiors for his handling of informants. As described supra, he consistently was given the highest possible ratings for his overall performance and his work with informants, even after questions arose about whether he might be Bulger's and Flemmi's "pipeline."

We recognize that not every agent in the FBI's Boston Office condoned Connolly's tactics or ignored every allegation of serious criminal behavior by Bulger and Flemmi. To the contrary, SAC Sarhatt looked into allegations of leaks related to a wiretap in the late 1970s and, in a personal interview of Bulger, asked if he had received any information from a member of the FBI. Bulger responded negatively. Id. at 83 n.49. Fitzpatrick, who was in charge of the C-3 Squad through the mid-1980s, testified that he locked up investigative files on the Wheeler murder after Agents Montanari and Brunnick expressed concerns that Connolly had been rifling through the material and passing information along to Bulger. Tr. Day 7, at 21-24.[39] Brunnick and Montanari amassed substantial files on the Wheeler-Halloran-Donahue-Callahan murders in what appears to have been, on their part, a good-faith investigation that was frustrated by the Boston Office's collegial

_____

[39] Montanari testified that he never told Fitzpatrick about Connolly rifling through his files and did not remember Brunnick expressing such a concern. Tr. Day 13, at 89.

relationship with Bulger and Flemmi.[40]  Supervisor Ring chastised Connolly for being overly friendly with Bulger and Flemmi and instructed him to stop meeting with informants at his own home. Id. at 98; Tr. Day 16, at 76, 80 (Ring testimony).  But such discrete expressions of concern about Connolly's interactions with the pair and their possible involvement in serious criminal activity do not dispel the dominant impression created by the record that the FBI, both within the Boston Office and at Headquarters in Washington, engaged for years in a strategy that gave Connolly wide berth in his interactions with Bulger and Flemmi.

The United States argues that, even conceding that the FBI took some steps to preserve the flow of information from Bulger and Flemmi, Connolly's disclosure of McIntyre's identity – leading foreseeably to his death – was "dramatically different from all of the other acts cited by the plaintiffs" and directly contrary to the FBI's interests.  That assertion does not fairly reflect the record.  As we have described, Connolly had revealed sensitive information in the past, including the identity of informants.  FBI Headquarters knew that other law enforcement agencies suspected Connolly of being the leak in the Boston Office, but it made no

---

[40] The district court commented that "the investigation is more notable for what was not done than for what was done," including the absence of "serious interrogation of the prime suspects, Bulger and Flemmi."  Id. at 93.

effort to seriously investigate the allegations or to terminate Connolly's relationship with Bulger and Flemmi. Unquestionably, the disclosure at issue in this case was officially unauthorized and forbidden. However, it was not outside Connolly's customary range of activity. Even if we accept that the FBI's failure to seriously investigate the allegations against Connolly, and to instead praise his abilities, does not constitute tacit approval of his methods, the agency's attitude at least reflects a judgment that Connolly's at-the-edge conduct could be tolerated for the greater good of bringing down La Cosa Nostra. McIntyre's death was one of the consequences of that attitude.

The United States argues that deeming Connolly's leak to be within the scope of his employment leads inevitably to the conclusion that Connolly also would have been acting within the scope of his employment if he had shot McIntyre himself. That dramatic argument ignores the claim actually before us. Nothing in this record suggests that Connolly committed acts of violence himself that were condoned by the FBI. By contrast, the leak of McIntyre's identity fell within the range of activity that had become customary for Connolly without reprisal from his superiors -- despite their awareness that he may be engaging in such conduct. At some point, unauthorized conduct will cross the line between acts that fall within the employee's scope of employment and those that are so far removed from the employer's methods and purposes

that they fall outside it. The question here was where on the spectrum to place Connolly's leak of McIntyre's identity. For the reasons we have discussed, we hold that the scope of Connolly's employment was broad enough to encompass this kind of conduct.

2. Prong Three: Motivation

The district court did not commit clear error in concluding that Connolly's favors to Bulger and Flemmi – including his unauthorized disclosure of confidential information – were motivated at least in part by a desire to advance the FBI's agenda. See 447 F. Supp. 2d at 111.[41] Through his connection with Bulger and Flemmi, Connolly was able to simultaneously help the FBI succeed in its efforts against LCN and help Bulger and Flemmi in their quest to control organized crime in Boston, thereby solidifying his status in both realms. Connolly received both salary increases and monetary awards from the FBI on the basis of his performance, which, as we have explained, was highly praised

---

[41] After noting that he credited Flemmi's testimony that Connolly received more than $200,000 in cash and gifts from Bulger and Flemmi, the district court explicitly found that "Connolly was motivated in part by greed and his friendship with Flemmi and especially Bulger." 447 F. Supp. 2d at 111. The court then rejected the notion that Connolly's motivations were "purely personal." Id. (emphasis omitted). Relying on its extensive review of the decades-long history of Connolly's relationship with the two men, the court stated: "For reasons already discussed, I find that Connolly was motivated, at least in part, by a desire to promote the FBI's goal of taking down Cosa Nostra through the use of Bulger and Flemmi as informants." Id.

because of his success in working with Bulger and Flemmi.  Id. at 97.

The government points out that the record contains no direct evidence that Connolly intended to benefit the FBI by revealing McIntyre's identity, and it emphasizes that every law enforcement officer who testified stated that leaking informant identity is always harmful to investigating agencies.  However, the district court did not have to find that identifying McIntyre was itself in the FBI's interest.  Providing Bulger and Flemmi with any confidential information of use to them would reinforce the relationship between Connolly and his informants and invite their continued reciprocity with information about LCN.  Thus, even if Connolly understood that revealing an informant's identity might in the abstract harm the FBI's future ability to recruit other informants, that does not diminish the immediate benefit Connolly would perceive for the FBI from his efforts to get useful information about LCN from these individuals.  Such a cost-benefit analysis seems particularly rational in the context of the FBI's national priority to eliminate LCN.  See id. at 62 (citing April 23, 1980 memo from FBI Director to Attorney General).

Hence, the facts of this case are unlike those in the cases cited by the government as examples of employee conduct that is not fairly attributed to the employer.  The circumstances here are easily distinguishable, for example, from a simple

embezzlement, see In re American Biomaterials Corp., 954 F.2d 919, 924-25 (3d Cir. 1992), from a day care center employee's sexual assault of children, Worcester Ins. Co. v. Fells Acres Day Sch., 558 N.E.2d 958, 967 (Mass. 1990), and from the robbery and murder of a courier by customs agents, Attallah v. United States, 955 F.2d 776, 781 (1st Cir. 1992). In none of these cases is there a plausible theory that the employee's action could have been motivated in part by the employer's interests. See 447 F. Supp.2d at 111 n.96 (distinguishing Atallah and similar cases because "there is no obvious way in which the employees' motivations would overlap" with those of the employers). Nor does the $200,000 in money and gifts that Connolly received from Bulger and Flemmi require a finding that the McIntyre leak was solely a personal endeavor. The record does not suggest that Connolly received payments for particular tips, but rather that he received periodic rewards as part of the ongoing relationship that the FBI expected him to nurture.[42] The district court therefore permissibly found that the McIntyre disclosure was partially motivated by Connolly's desire to maintain his relationship with Bulger and Flemmi in order to further the FBI's effort to dismantle La Cosa Nostra.

---

[42] Flemmi testified that he exchanged money and gifts with multiple members of the C-3 Squad to maintain "goodwill and protection." Tr. Day 2, at 93-104.

3. Conclusion on Scope of Employment

In agreeing with the district court that the FBI is responsible for McIntyre's death as the foreseeable consequence of Connolly's leak, we do not suggest that such an outcome was desired or even contemplated by Connolly's superiors. Moreover, contrary to the government's suggestion, this outcome is not a judgment that the government's interests were in fact advanced by McIntyre's murder. Our conclusion, like the district court's, is only that disclosure of McIntyre's identity was in keeping with both the deferential treatment Bulger and Flemmi regularly received from all levels of the FBI and the kind of conduct Connolly undertook on other occasions with seeming acquiescence from his superiors. As such, it fell within the scope of his employment.

## III.

The district court initially entered judgment in this case without addressing post-judgment interest. The plaintiffs subsequently filed a motion under Federal Rule of Civil Procedure 59(e) seeking an amended judgment that included interest. The court granted the motion on March 14, 2007, stating that post-judgment interest would run "only from the date a party seeking recovery of interest files the judgment with the Secretary of the Treasury until the judgment is paid." The next day, the court entered an amended judgment that did not include the timing

language, but which provided for post-judgment interest to accrue at a rate of 5.05%.

The United States then filed its own Rule 59 motion, arguing that, under 31 U.S.C. § 1304(b)(1), it may be liable for post-judgment interest "only from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance." The court denied the government's motion, and the government asks on appeal that we explicitly hold that the statutory time period applies to the accrual of interest.

In a cross-appeal, the plaintiffs contend that the proper post-judgment interest rate is 5.10% rather than the 5.05% rate specified by the district court. The government concedes that the higher rate is correct, and the plaintiffs do not dispute that the statutory time period applies. Consequently, on remand, the district court should revise its order with respect to post-judgment interest accordingly.

The judgment of the district court in favor of plaintiffs is affirmed. The case is remanded for entry of a corrected order on post-judgment interest. No costs are awarded.

So ordered.